[No. A123756. First Dist., Div. Five. Jan. 3, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH CUA, Defendant and Appellant.

584

COUNSEL

Stephen B. Bedrick, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Seth K. Schalit and Scott Mather, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BRUINIERS, J.**—Joseph Cua was convicted by jury of the murders of Fernand and Suzanne Wagner. He was connected to the commission of the offenses in part by genetic trace evidence. He challenges the scientific validity of that evidence, and contends that his trial attorneys were ineffective in failing to object to its admission. We affirm.

## I. BACKGROUND AND PROCEDURAL HISTORY

Cua was employed by the Wagners as a property manager, and lived rent free at a building which the Wagners owned in Burlingame. In 2004 and 2005, the Wagners had received gross rental income of approximately $820,000 from the three rental properties they owned. In early June 2006, Fernand learned from his bank, Wells Fargo, that the cash balance in the Wagners' business account was lower than anticipated, and insufficient to be able to make quarterly tax payments coming due. On Saturday, June 10, 2006, Fernand met with the Millbrae Wells Fargo branch manager, Asha Kumar. He showed Kumar faxed copies of deposit receipts that did not match the bank's records of deposits to his account. The facsimile copies cut off the bottom portion of the deposit receipts, which would have identified the teller receiving the deposits, the time of the transaction, and other "key" information. These deposits had purportedly been made by Cua, who had faxed the copies of the deposit receipts to the Wagners. Kumar asked Fernand to obtain the original deposit receipts so that she could investigate, and she asked Fernand to return on Tuesday (June 13). Kumar saw Fernand at the bank on Monday or Tuesday (June 12 or June 13), as Fernand was making another deposit. She reminded him that she still needed the original deposit slips, and Fernand said he would get them from his manager.

On June 13, 2006, Edith Edmonds telephoned the Wagners' home about 9:25 a.m. She first spoke to Suzanne, who informed her that "Joe's here." Edmonds knew Cua from working with him as a real estate agent in the past, and she asked to speak with Cua to congratulate him on the recent birth of a child. She also spoke briefly with Fernand, but ended the call because she felt that she was interrupting a business meeting.[1]

On June 14, 2006, worried coworkers called Millbrae police when Suzanne Wagner failed to come to work. Officer Robert Raw went to the Wagner's home about 12:30 p.m. No one responded to knocks on the door or to the doorbell. Raw found the mailbox full of mail, and newspapers on the front porch from both June 13 and June 14. Looking into a side window, he saw the body of a white female, clothed only in a bra, with blood pooled around her head. A white male was lying facedown nearby, also with apparent head trauma and blood pooling around the body.

On entry to the house, Raw and other officers identified the bodies of Fernand and Suzanne. The den where the bodies were found was "messy," with blood splatters, pooled blood, and articles of clothing in the room.

---

[1] It was stipulated that the Wagners received two other calls that morning. Lorraine Peterson spoke to Suzanne "close to noon" to wish her a happy birthday. Fernand's brother, Norbert, spoke to both Fernand and Suzanne between 10:30 and 11:00 a.m.

Suzanne died of multiple blunt injuries associated with strangulation. She sustained multiple other blunt trauma injuries, with 27 separate areas of trauma to her head and neck, as well as bruising, scrapes and other injuries to her torso. She also suffered nine broken ribs. In addition, there was an incised wound to the opening of her vagina caused by a sharp cutting instrument. The strangulation wounds were consistent with manual strangulation. Fernand received multiple blunt injuries associated with a six-inch-long incised wound to the neck, extending from the area of the mouth on his left side to the back outside of the neck. The wound partially cut the jugular vein. Fernand sustained 21 discrete blunt injuries to the head and neck area, fractured ribs, and lacerations to both arms and hands.

Other than the den, the home appeared "tidy." Family members examining the other areas of the house noticed nothing that appeared unusual, other than a rug "bunched up" in an upstairs area. Drawers were open in an upstairs office area. A purse was found lying on the kitchen floor, and a bloody footprint could be seen on one of the lower stairsteps. Police later determined that a knife was missing from a knife block in the kitchen that could not be located in the house. Fernand's watch, which had a gold coin face, was missing. The Wagners' Cadillac Deville also was missing.

Apparent bloodstains were found on the downstairs bathroom floor, on the bathroom doorjamb, on the sink and on the toilet seat cover. They appeared diluted, as if someone had been washing their hands. Suzanne's clothing was strewn about the den, and her pantyhose and underwear were intertwined, as if they had been taken off together. There were bloodstains confirmed on the underwear, but no semen. Shoe prints with red-brown staining were observed on the floor.

The Wagners' Cadillac was located in Daly City using the vehicle's GPS system. A woman's pearl ring was found under the right side of the front passenger seat. There was blood on the ring. A bloodstain was observed on the passenger seat cushion near the ring. DNA swabs were taken from the vehicle, including from the steering wheel.

On Friday, June 16, 2006, Millbrae police received a call from a family friend of Cua's estranged wife, Joy, who had purportedly told her parents that she recently had seen Cua and that he had evident injuries. Joy Cua was interviewed by investigating officers on June 18. She told them that she had seen Cua on that Thursday and Friday (June 15 and June 16), and that Cua's right hand was swollen, with a red or purple discoloration on the back and webbing of the hand. He also had cuts on the webbing of his right hand and one of his fingers. His right foot was swollen, and he had a reddish or purple discoloration or bruise to his shin.

A forensic accounting examination of Cua's checking accounts and the Wagners' accounts revealed that Cua had been "skimming" rents from the Wagners' properties, embezzling about $238,000 between January 2004 and June 2006.[2] Cua's salary as the Wagners' property manager was about $14,000 per year. He reported no taxable income other than his salary. He used the money embezzled from the Wagners to pay his personal expenses, including the mortgage on a Southern California home, car loans for three cars, boat docking fees at two marinas, and payments to various individuals.

Cua had an ongoing intimate relationship with Tracey Story. He told Story that he was a property manager and investment advisor, and claimed that he was the trustee and co-owner, along with Fernand Wagner, of the Burlingame building where he lived. Cua said that his annual income was around $600,000, and told Story at various times that he was worth $11 million or $23 million. Cua claimed that he had once been in a fight in Mexico with several "gang-type" men, and that he had fatally injured three or four of the men with his hands and feet, and had left the others in "bad shape." He did not tell Story that he was married to Joy Cua.

On June 13, 2006, Cua called Story on her cellular telephone and sounded upset. She also spoke to him by telephone on the evening of June 17, talking about the breakup of their relationship, and that Cua sounded "in very bad shape."

Cua had made an airline reservation for a flight on the evening of June 13, 2006, from Oakland to Ontario, California. He did not make the flight, instead driving to San Luis Obispo, where he checked into a motel about 1:00 a.m. on the morning of June 14.

Following the Wagners' deaths, Cua made several telephone calls to members of the Wagners' family, including calls on June 14 and June 16, 2006, claiming that Fernand and Suzanne had placed him in charge of their business affairs and had made him executor of their estate. He asked Marc Wagner, Fernand's nephew, for his help "to go to the bank," although he did not explain what help he needed or why he needed to go to the bank. On June 17, Cua called Dan Doherty, one of the Wagners' commercial tenants in the San Jose building, and told Doherty that the Wagner family wanted to sell that building within two or three weeks. He offered to sell the building to Doherty and his partners if they could raise the money for a "quick sale." He said that Cua sounded nervous and upset.

Cua had been named by the Wagners as trustee in an earlier 1993 version of a trust instrument. Under the terms of that instrument, Cua had authority to

---

[2] One commercial tenant, Dan Doherty, testified that beginning sometime in 2002 or 2003 he began making rent checks payable to Cua at Cua's request, rather than to Wagner Buildings.

sell the Wagners' assets if both were deceased, with the right to receive a fee of 0.75 percent of the value of the estate. Cua had been replaced as trustee in subsequent versions of the trust, although he had still been designated as the broker for sale of the Wagners' three commercial properties—but only in the event that both Fernand and Suzanne were deceased. A broker's commission based on the value of the properties at the time of the Wagners' deaths would have been about $300,000.

A warrant was issued for Cua's arrest, and he was taken into custody on June 18, 2006, in Oxnard, California. At the time of his arrest, Cua was driving a pickup truck with a stolen license plate registered in Coalinga, California. When asked if he knew why he was being arrested, Cua said, "I have an idea."

When Cua was interviewed by Detective Frank Taylor on Monday, June 19, 2006, Taylor observed healing injuries to Cua's right hand and right foot, including swelling, discoloration, and a scabbed wound on Cua's right ring finger about three-fourths of an inch long. Tracey Story testified that she was with Cua on the evening of June 12, both at dinner and later in a bedroom when he was unclothed, she observed no injuries to his hands or anywhere on his body.

In a letter from Cua to his wife found by Taylor in the truck, Cua said that he had discovered the Wagners dead in their home on Tuesday afternoon, and that he did not call police because he "got scared that [he] would be the prime suspect" because he "was known to be there at the house" (referring in the letter to Edith Edmonds's telephone call). Cua said that he was afraid "the police suspect me for what I found out." The letter also stated that it was Cua's "last will and testament."

*The DNA Evidence*

DNA analysis was performed on the bloodstains from the Wagners' residence and on the bloodstains and DNA swabs from the Wagners' Cadillac. The sample taken from the bathroom doorjamb showed contributions of genetic material from at least two individuals. Both Fernand and Cua were identified as possible contributors. Statistically, the odds of another contributor with this DNA pattern were one in 660 million for African-Americans, one in 110 million for Caucasians, and one in 72 million for Hispanics.[3] The bloodstain on Suzanne's underwear showed a DNA mixture from at least

---

[3] As discussed *post*, after the verdict the prosecution provided the defense with an amended report from the criminalist who analyzed the DNA evidence, revising her opinion of the statistical significance of the DNA probability match to one in 8.1 million African-Americans, one in 520,000 Caucasians, and one in 620,000 Hispanics.

three individuals. Fernand and Cua could not be excluded as contributors. Suzanne could not be excluded as a "minor DNA contributor." The odds of another contributor with this DNA pattern were one in 49 million for African-Americans, one in one million for Caucasians, and one in 1.6 million for Hispanics. The forensic examiner concluded that Cua was the single source of the bloodstain on the passenger seat of the Wagners' Cadillac.[4] Cua also could not be excluded as a source of DNA found on the steering wheel of the Cadillac. Other trace evidence was found at the scene of the homicides that could not be attributed to Cua.[5]

Cua was charged by information with two counts of murder with the use of a "sharp edge cutting instrument." (See Pen. Code, §§ 187, 12022, subd. (b).) The special circumstance of multiple murder was alleged. (Pen. Code, § 190.2, subd. (a)(3).) The district attorney elected not to seek the death penalty.

The evidentiary phase of the trial commenced on June 12, 2008, and concluded on June 25. On June 27, the jury convicted Cua of both murders, finding them to be in the first degree, and found all enhancement allegations to be true.

Cua motioned for new trial on the ground of the newly discovered DNA statistical evidence. The motion was denied on December 18, 2008, and Cua was sentenced to consecutive terms of life imprisonment without the possibility of parole.

Cua filed a timely notice of appeal.

## II. Discussion

Cua challenges the scientific foundation for the DNA evidence presented by the prosecution, and contends that his trial counsel was ineffective for failure to object to its admission. He argues that admission of such evidence without a valid foundation violated his federal constitutional right to due process under the Fifth and Fourteenth Amendments to the United States Constitution. Cua also contends that the trial court abused its discretion in denying his motion for new trial after the prosecution provided an amended report, two months after the verdict, in which the criminalist who analyzed

---

[4] The examiner concluded that Suzanne Wagner was the single source of the blood on the ring found in the car.

[5] A fingerprint was found on Suzanne's belt, which did not belong to Cua. The postmortem exemplar prints for Fernand and Suzanne Wagner were insufficient to make a conclusive comparison. DNA in other bloodstains in the house belonged to Suzanne or to Fernand. DNA was found in material under Suzanne's fingernails, including her own and two "low level minor" male contributors who could not be identified.

the DNA samples substantially lowered the probability significance of the DNA match from the bathroom doorjamb. We find no error.

## A. *Introduction of DNA Evidence*

The trial court's evidentiary rulings are reviewed for abuse of discretion. (*People v. Geier* (2007) 41 Cal.4th 555, 586 [61 Cal.Rptr.3d 580, 161 P.3d 104] (*Geier*).) We first observe that Cua appears to confuse issues relating to the weight and significance of the evidence with the foundational requirements for admissibility of that evidence. He argues that the prosecution presented "scientifically invalid" testimony that the bloodstain found on the passenger seat of the Wagners' Cadillac "belonged" to him—and that it was prosecutorial misconduct to do so. Cua contends that there was insufficient "foundation" for evidence of the statistical significance of the correlation between his DNA and that found in trace samples on the Wagners' bathroom doorframe and on Suzanne Wagner's panties. In general, criticisms about the quality of DNA testing go to the weight of the evidence and are proper subjects for cross-examination. (*People v. Wright* (1998) 62 Cal.App.4th 31, 41–42 [72 Cal.Rptr.2d 246].)

Further, as Cua concedes, his trial counsel made no objection to admission of the evidence he now contests. Failure to object at trial to the scientific foundation for admission of evidence under *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] (*Kelly*) forfeits the claim for appeal. (*People v. Doolin* (2009) 45 Cal.4th 390, 448 [87 Cal.Rptr.3d 209, 198 P.3d 11].) His failure to make any timely or specific objection to the DNA evidence is also fatal to his claim. (Evid. Code, § 353.) " 'What is important is that the objection fairly inform[s] the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling.' " (*Geier, supra*, 41 Cal.4th at p. 609, quoting *People v. Partida* (2005) 37 Cal.4th 428, 435 [35 Cal.Rptr.3d 644, 122 P.3d 765].) In *Geier*, the Supreme Court found that the defendant forfeited, by failure to object, a similar but converse claim to that which is asserted here—in that instance, that the prosecution improperly limited DNA statistical evidence to the defendant's population group. (*Geier, supra*, 41 Cal.4th at p. 609.)

Cua's constitutional due process claims are likewise forfeited by failure to assert them in the trial court. (See *People v. Tafoya* (2007) 42 Cal.4th 147, 166 [64 Cal.Rptr.3d 163, 164 P.3d 590] [defendant forfeited confrontation clause claim by failing to raise it at trial]; *People v. Rudd* (1998) 63 Cal.App.4th 620, 628–629 [73 Cal.Rptr.2d 807] [generally a constitutional claim must be raised in the trial court to preserve the issue for appeal].) *Geier* similarly found the constitutional claims forfeited. (*Geier, supra*, 41 Cal.4th at pp. 610–611.)

While we find that Cua has forfeited his objections to the DNA evidence, in light of his claim of ineffective assistance of counsel we also consider the admissibility of the DNA evidence. We conclude that the evidence was properly admitted.

### 1. *Scientific Foundation*

"Forensic DNA [(deoxyribonucleic acid)] analysis is a comparison of a person's genetic structure with crime scene samples to determine whether [that] person's structure matches that of the crime scene sample such that the person could have donated the sample." (*People v. Nelson* (2008) 43 Cal.4th 1242, 1257–1258 [78 Cal.Rptr.3d 69, 185 P.3d 49] (*Nelson*).)

DNA is found in the nucleus of virtually all cells in the human body. The DNA is organized into 23 pairs of homologous chromosomes; one chromosome in each pair being inherited from the mother and the other from the father. (See discussion in *People v. Soto* (1999) 21 Cal.4th 512, 519–521 [88 Cal.Rptr.2d 34, 981 P.2d 958] (*Soto*) [relying on two reports of the National Research Council (NRC)[6]—The Evaluation of Forensic DNA Evidence (1996 NRC Report) & DNA Technology in Forensic Science (1992 NRC Report)].) "A chromosome is a long DNA molecule in the shape of a spiral staircase. (1992 NRC Rep., *supra*, p. 33.) 'It consists of two parallel spiral sides (i.e., a double helix) composed of repeated sequences of phosphate and sugar. The two sides are connected by a series of rungs, which constitute the steps in the staircase. Each rung consists of a pair of chemical components called bases. There are four types of bases—adenine (A), cytosine (C), guanine (G), and thymine (T). A will pair only with T, and C will pair only with G.' [Citation.] There are over 3 billion base pairs in the 46 chromosomes of a single human cell. When a cell reproduces, the parallel sides, or strands, of its DNA separate, and the bases of each strand pair off with the complementary bases of a new strand. (1996 NRC Rep., *supra*, p. 63.)" (*Soto*, at p. 520, fn. omitted.)

"A person's individual genetic traits are determined by the sequence of base pairs in his or her DNA molecules. That sequence is the same in each molecule regardless of its source (e.g., hair, skin, blood, or semen) and is unique to the individual. Except for identical twins, no two human beings have identical sequences of all base pairs. [¶] In most portions of DNA, the sequence of base pairs is the same for everyone. Those portions are responsible for shared traits such as arms and legs. In certain regions, however, the

---

[6] "The NRC is a private, nonprofit society of distinguished scholars that is administered by the National Academy of Sciences, the National Academy of Engineering and the Institute of Medicine. The NRC formed the Committee on DNA Technology in Forensic Science to study the use of DNA analysis for forensic purposes, resulting in the issuance of the 1992 report." (*Soto, supra*, 21 Cal.4th at p. 536, fn. 30.)

sequence of base pairs varies from person to person, resulting in individual traits. A region—or locus—that is variable is said to be polymorphic." (*People v. Barney* (1992) 8 Cal.App.4th 798, 805–806 [10 Cal.Rptr.2d 731].)

"Because there is no practical way to sequence all three billion base pairs in a person's DNA, forensic scientists seek to identify individuals through variations in their base-pair sequences at polymorphic DNA locations [on a region of a chromosome] (loci). Each variation in a [base-pair] sequence[, i.e. a different form of gene at a particular locus,] is called an 'allele.' . . . In the absence of a nonmatch that conclusively eliminates the suspect as the source of the crime scene sample, each match between alleles from the suspect and from the crime scene may be accorded statistical significance." (*Soto, supra,* 21 Cal.4th at pp. 520–521, fn. omitted; see 1996 NRC Rep., *supra,* pp. 214, 216.)

In *People v. Venegas* (1998) 18 Cal.4th 47, 53–54 [74 Cal.Rptr.2d 262, 954 P.2d 525] (*Venegas*), our Supreme Court recognized the general scientific acceptance, and evidentiary admissibility under *Kelly* of restriction fragment length polymorphism (RFLP) analysis as a means of comparing the DNA in a known sample with the DNA in a questioned sample. Another method of DNA analysis is known as polymerase chain reaction (PCR). PCR is " 'a molecular biology technical procedure for exploiting genetic differences in DNA,' whereby small pieces of DNA are copied or amplified." (*People v. Morganti* (1996) 43 Cal.App.4th 643, 662 [50 Cal.Rptr.2d 837].) PCR analysis is also generally accepted in the scientific community. (*Id.* at p. 671; approved in *People v. Doolin, supra,* 45 Cal.4th at pp. 446–448.) "The PCR method is superficially similar to the RFLP method in forensic applications, because each method is a valid scientific technique for comparing the genetic structure of a sample and a suspect. However, the RFLP method compares the lengths of strands of DNA from the two sources,[7] while the PCR method amplifies the DNA, and then compares the existence or nonexistence of certain specific genetic markers in the two DNA sources. [Citations.]" (*People v. Wright, supra,* 62 Cal.App.4th at p. 40, fn. 1.) " 'There are three subtypes of PCR testing: DQ-Alpha, which tests a single genetic marker; Polymarker, which tests five genetic markers; and the STR, which tests three or more genetic markers. [Citation.] The RFLP and PCR methodologies, including the PCR subtypes, have acquired general acceptance in the scientific community. [Citations.]' " (*People v. Henderson* (2003) 107 Cal.App.4th 769, 777 [132 Cal.Rptr.2d 255], fn. omitted (*Henderson*), citing, inter alia, *People v. Hill* (2001) 89 Cal.App.4th 48, 57 [107 Cal.Rptr.2d 110] & *People v. Allen* (1999) 72 Cal.App.4th 1093, 1100 [85 Cal.Rptr.2d 655] [approving use

---

[7] This analysis compares the lengths of sets of multiple polymorphic fragments containing " 'variable number tandem repeats' " (VNTR alleles) obtained from a suspect's DNA and from crime scene samples. (*Venegas, supra,* 18 Cal.4th at pp. 59–60.)

of PCR STR (short tandem repeats) analysis and noting the conclusion of the 1996 NRC Rep. (at p. 71) that STR testing is " ' "coming into wide use," ' " and that " ' "STR loci appear to be particularly appropriate for forensic use." ' "[8]].) It appears that PCR analysis, using 15 STR comparison loci, was utilized here.[9]

" 'PCR forensic analysis involves three steps. First, DNA is extracted from cells in the sample. Second, select regions of the DNA are amplified. Scientists have identified these regions, also referred to as genes or genetic markers, as areas that exhibit great genetic variation among the population. . . . After amplification, in the third and final step of PCR analysis, the amplified gene is "typed," through the use of DNA probes, to identify the specific alleles it contains. [Citation.] If the DNA profile thus constructed differs in any way between the suspect and the sample, the suspect is excluded.' " (*Henderson, supra*, 107 Cal.App.4th at p. 778.)

If a match is found, the next question is the statistical significance of the match. (*Henderson, supra*, 107 Cal.App.4th at p. 778; *People v. Wilson* (2006) 38 Cal.4th 1237, 1242 [45 Cal.Rptr.3d 73, 136 P.3d 864].) The analyst calculates the statistical probability that the DNA profile of a person, selected at random from the relevant population, would contain the same pattern of alleles represented in the evidence sample. (*Venegas, supra*, 18 Cal.4th at p. 65.)

### 2. *Statistical Significance*

When a suspect's sample is matched to the crime scene evidence, "the DNA profile of the matched samples is compared to the DNA profiles of other available DNA samples in a relevant population database or databases in order to determine the statistical probability of finding the matched DNA profile in a person selected at random from the population or populations to which the perpetrator of the crime might have belonged." (*Soto, supra*, 21 Cal.4th at p. 518.) "Experts calculate the odds or percentages—usually stated as one in some number—that a random person from the relevant population would have a similar match." (*People v. Wilson, supra*, 38 Cal.4th at p. 1239.)

---

[8] The 1996 NRC Report also notes that PCR analysis permits an exact identification of each allele, and it obviates the need for matching and "binning" required in VNTR (variable number tandem repeats) analysis to determine statistical significance. (1996 NRC Rep., *supra*, p. 70.)

[9] The United States Supreme Court has recently observed that "STR testing is extremely discriminating, can be used on small samples, and is 'rapidly becoming the standard.' " (*District Attorney's Office for Third Judicial Dist. v. Osborne* (2009) 557 U.S. ___, ___, fn. 3 [174 L.Ed.2d 38, 129 S.Ct. 2308, 2315, fn. 3].)

"Databases have . . . been developed to determine population frequencies of the various alleles that may be detected using PCR.[10] (1996 [NRC] Rep., *supra*, at pp. 117–119.) [¶] Once population frequencies have been determined for each locus, the analyst must calculate the probability that a person at random would have the same *combination* of matches at all loci." (*People v. Reeves* (2001) 91 Cal.App.4th 14, 31 [109 Cal.Rptr.2d 728].) "The most straightforward means of making this calculation is through application of the 'product rule.' " (*Venegas, supra*, 18 Cal.4th at p. 65.) The "product rule" posits that the probability of several things occurring together is the product of their separate probabilities. (See Kaye, *DNA Evidence: Probability, Population Genetics, and the Courts* (1993) 7 Harv. J.L. & Tech. 101, 127–128 (hereafter Kaye, *DNA Evidence*).) "The essence of the product rule is the multiplication of individual band probabilities to arrive at an overall probability statistic expressed as a simple fraction, such as 1 in 100,000." (*Venegas, supra*, 18 Cal.4th at p. 66.) "Thus, the product rule is simply the multiplication of the frequencies found at each locus studied. The result is a probability statistic that reflects the overall frequency of the complete DNA profile. It is often quite small." (*People v. Reeves, supra*, 91 Cal.App.4th at p. 31.)

■ "[T]he number derived from the product rule 'represents two concepts: (1) the frequency with which a particular DNA profile would be expected to appear in a population of unrelated people, in other words, how rare is this DNA profile ("rarity statistic"), and (2) the probability of finding a match by randomly selecting one profile from a population of unrelated people, the so-called "random match probability." ' [Citation.]" (*Nelson, supra*, 43 Cal.4th at p. 1266.) It is "settled that the product rule reliably shows the rarity of the profile in the relevant population."[11] (*Nelson*, at

---

[10] "[F]orensic laboratories use one or more population databases containing measurements of the DNA fragments of several hundred persons at each of the loci reached by the probes. The samples from which those measurements are derived come from such varied sources as blood banks, hospitals, clinics, genetics laboratories, and law enforcement personnel. (See 1996 NRC Rep., *supra*, p. 126.)" (*Soto, supra*, 21 Cal.4th at p. 523, fn. omitted.)

[11] The product rule is not the only statistical method of representing the significance of a DNA match. The Supreme Court in *Soto* approved used of the *unmodified* product rule in assessing the probative significance of a DNA match. (*Soto, supra*, 21 Cal.4th at pp. 514–516.) In *Venegas*, the court had earlier found general scientific acceptance of the so-called "modified ceiling principle," recommended for use in the 1992 NRC Report, which modifies the product rule in such a way as to select random match probability figures most favorable to the accused from the scientifically based range of probabilities. (*Venegas, supra*, 18 Cal.4th at pp. 84–90.) The 1996 NRC Report concluded that sufficient data had accumulated to show that ceiling principle was not necessary and endorsed use of the unmodified product rule. (*People v. Reeves, supra*, 91 Cal.App.4th at p. 32.)

As one commentator has noted, "Of all the technological and scientific issues in this debate, the most difficult for the courts, and those that have generated the most disagreement within the scientific community, involve statistics. The disagreements revolve around one central

p. 1263, citing *Soto, supra*, 21 Cal.4th 512.) "It is relevant for the jury to know that most persons of at least major portions of the general population could not have left the evidence samples." (*People v. Wilson, supra*, 38 Cal.4th at p. 1245.)

### 3. The DNA Matches

#### a. The Cadillac

Mona Ten had been a criminalist with the San Mateo County Sheriff's forensic laboratory for over 33 years and was assigned to the forensic biology unit. She was accepted, without objection, as an expert in examination of evidence for biological fluids and DNA analysis. She testified that she analyzed a stain found on the right side bottom cushion of the front passenger seat of the Wagners' Cadillac. The stain tested presumptively positive for blood. The sample was determined to be a "single-source" stain, from only one donor. She compared the DNA profile from the stain with that from a buccal swab sample from Cua. The profile matched at all 15 loci.[12] She concluded that the stain "belonged to Joseph Cua."[13]

Cua does not contest here, and did not contest in the trial court, the criminalist's opinion of a profile match between Cua and the evidence sample at 15 separate loci, but challenges only the expression of that conclusion. Cua contends that the testimony that the evidence sample "belonged" to him was "scientifically invalid" and it confused " 'random match probability' " with " 'source probability' "—what is sometimes referred to as the

challenge—presenting the degree of similarity between DNA in a crime sample and DNA in a defendant's sample so that a judge or jury can fairly assess the probative value of DNA evidence. The predominant procedure for criminal DNA testing in the United States involves two major steps: first, declaring a 'match' between the two samples, and second, if a match is declared, estimating its relative frequency in a reference population. This frequency indicates, at least indirectly, the significance of a match. It reveals whether the match is as common as a polite smile or as rare as the enigmatic expression of the Mona Lisa." (Kaye, *DNA Evidence, supra*, 7 Harv. J.L. & Tech. at p. 104.) For a discussion of four different suggested methods for calculating the statistical significance of a match see *Nelson, supra*, 43 Cal.4th at pages 1261–1263, citing *U.S. v. Jenkins* (D.C. Cir. 2005) 887 A.2d 1013, 1019–1020.

As the Supreme Court noted in *Nelson*, " '[n]othing in the *Kelly* test requires that there be one and only one approach to a scientific problem. The question is whether scientists significant in number or expertise publicly oppose a technique as unreliable, not whether some scientists believe there may be an alternative, perhaps even better, technique available.' " (*Nelson, supra*, 43 Cal.4th at p. 1263.)

[12] She found one additional allele at one locus. At the preliminary hearing she explained that this single marker could have come from the car seat itself. The issue was not pursued on cross-examination at trial.

[13] She also testified that Cua was not excluded as a contributor (along with Fernand Wagner and Suzanne Wagner) to material recovered from the steering wheel of the car.

"prosecutor's fallacy." As previously noted, Cua has forfeited this claim by his failure to make any objection in the trial court. (*Geier, supra,* 41 Cal.4th at pp. 609–611.) He is also wrong in both his characterization and his conclusion.

First, the testimony presented here is not an instance of the "prosecutor's fallacy" as Cua suggests. The "prosecutor's fallacy" that Cua references is more accurately described as the "inversion fallacy" which "conflate[s] the conditional probability of the match given innocence with the conditional probability of innocence given the match" (e.g., concluding that the frequency of a specific DNA banding pattern in the Hispanic population is approximately one in six billion means that the chance that anyone but the suspect left the unknown samples at the scene of the crime is six billion to one). (Kaye, *DNA Evidence, supra,* 7 Harv. J.L. & Tech. at p. 159, fn. omitted; see also 1996 NRC Rep., *supra,* p. 133 ["[if] P equal[s] the probability of a match, given the evidence genotype[, it is a] fallacy . . . to say that P is also the probability that the DNA at the crime scene came from someone other than the defendant"].) Put another way, the fallacy is in attempting to convert the expected frequency of occurrence into odds of occurrence. (See Thompson & Schumann, *Interpretation of Statistical Evidence in Criminal Trials: The Prosecutor's Fallacy and the Defense Attorney's Fallacy* (1987) 11 Law & Hum. Behav. 167 (hereafter Thompson & Schumann).) The danger in the fallacy is that the probability of finding a random match can be much higher than the probability of matching one individual, given the weight of the non-DNA evidence. (*Id.* at pp. 170–171.)

Cua's contention notwithstanding, the criminalist here offered no opinion as to the "random match probability" (the probability of finding a match by randomly selecting one profile from a population of unrelated people), and made no attempt to create from that a misleading numerical characterization of the probability of Cua's guilt.

Cua is also incorrect that it is necessarily "scientifically invalid" for a DNA expert to testify that the evidentiary sample was left by the defendant—what is known as "source attribution." (See Budowle et al., *Source Attribution of a Forensic DNA Profile* (July 2000) Forensic Sci. Comm.; see also DNA Advisory Bd.,[14] *Statistical and Population Genetics Issues Affecting the Evaluation of the Frequency of Occurrence of DNA Profiles Calculated From Pertinent Population Database(s)* (July 2000) Forensic Sci. Comm.)

---

[14] The DNA Advisory Board was formed pursuant to the DNA Identification Act of 1994 (Pub.L. 103-322 (Sept. 13, 1994) 108 Stat. 2065) and was dissolved in 2000. (42 U.S.C. § 14131.) The Director of the FBI was required to appoint members from among nominations proposed by the head of the National Academy of Sciences and professional societies of crime laboratory officials, and the board included as members scientists from state, local, and private

Almost 15 years ago, the 1996 NRC Report observed that "[w]ith an increasing number of loci available for forensic analysis, we are approaching the time when each person's profile will be unique (except for identical twins and possibly other close relatives)." (1996 NRC Rep., *supra*, p. 161.) "Because more population data and loci already are available, and still more will be available soon, we are approaching the time when many scientists will wish to offer opinions about the source of incriminating DNA. [¶] . . . There might already be cases in which it is defensible for an expert to assert that, assuming that there has been no sample mishandling or laboratory error, the profile's probable uniqueness means that the two DNA samples come from the same person." (*Id.* at p. 194.) It has been calculated that the average random match probability for unrelated individuals for even 13 STR loci is less than one in a trillion, even in populations with reduced genetic variability. (Chakraborty et al., *The Utility of Short Tandem Repeat Loci Beyond Human Identification: Implications for Development of New DNA Typing Systems* (1999) 20 Electrophoresis 1682, 1688.)

Some courts have already recognized that, dependent upon the strength of a match, "it might be appropriate for the expert to testify that, except for identical twins or maybe close relatives, ' "it can be concluded to a reasonable scientific certainty that the evidence sample and the defendant sample came from the same person." ' [Citations.]" (*Nelson, supra*, 43 Cal.4th at p. 1262, fn. 1; see *People v. Johnson* (2006) 139 Cal.App.4th 1135, 1146, fn. 10 [43 Cal.Rptr.3d 587]; see also *People v. Wilson, supra*, 38 Cal.4th at pp. 1248–1249; *People v. Barney, supra*, 8 Cal.App.4th at p. 817; *People v. Allen, supra*, 72 Cal.App.4th at p. 1097 [expert concluded " 'within a reasonable degree of scientific certainty' " that defendant was the source of the semen stain based on PCR test matching at a total of nine genetic markers].)

Our Supreme Court has recently recognized that a genetic profile can be sufficiently unique to be a constitutionally sufficient description of a suspect in support of an arrest warrant. (*People v. Robinson* (2010) 47 Cal.4th 1104 [104 Cal.Rptr.3d 727, 224 P.3d 55] (*Robinson*).) The court agreed that " 'a DNA profile is arguably the most discrete, exclusive means of personal identification possible . . .' . . . [and that] ' "[a] genetic code describes a person with far greater precision than a physical description or a name." [Citation.]' [Citation.]" (*Id.* at p. 1134, citations omitted.) In *Robinson*, there was a DNA match at 13 loci, and the prosecution expert testified that there had been no reported cases of two people who are not identical twins matching at all 13 loci. (*Id.* at p. 1115.) The court further observed that

forensic laboratories, molecular geneticists and population geneticists not affiliated with a forensic laboratory, and a representative from the National Institute of Standards and Technology. (*Ibid.*)

"[w]hile a DNA profile match does not guarantee that the individual matched is guilty of the charged offense, studies have shown that the chance a positive match does not belong to the same person may be less than one in 500 million." (*Id.* at p. 1142, citing inter alia Moyer & Anway, *Biotechnology and the Bar: A Response to the Growing Divide Between Science and the Legal Environment* (2007) 22 Berkeley Tech L.J. 671, 684, fn. 64.) The United States Supreme Court has said that "[m]odern DNA testing can provide powerful new evidence unlike anything known before. Since its first use in criminal investigations in the mid-1980s, there have been several major advances in DNA technology, culminating in STR technology. It is now often possible to determine whether a biological tissue matches a suspect with near certainty." (*District Attorney's Office for Third Judicial Dist. v. Osborne, supra,* 557 U.S. at p. ___ [129 S.Ct. at p. 2316].) Our growing experience with use of DNA databases containing genetic samples from known offenders to provide "cold hit" matches of crime scene samples with DNA profiles of criminal suspects belies Cua's argument, unsupported by any expert opinion, that criminalist Ten's testimony was "scientifically invalid." (See, e.g., *Nelson, supra,* 43 Cal.4th 1242.)

The cases cited by Cua do not support his position. In *Nelson* the criminalist, as here, compared 15 loci and found a match at each one. (*Nelson, supra,* 43 Cal.4th at p. 1259.) "The prosecution presented evidence that the odds that a random person unrelated to defendant from the population group that produced odds most favorable to him could have fit the profile of some of the crime scene evidence [were] one in 930 sextillion (93 followed by 22 zeros)." (*Id.* at p. 1247.) Because of these "astronomical odds" and the fact that the world's total population is only about seven billion, the court recognized that "this evidence is tantamount to saying that defendant left the evidence at the crime scene." (*Id.* at pp. 1259, 1247.) As the 1996 NRC Report noted, the difference between a vanishingly small probability and an opinion of uniqueness is "slight." (1996 NRC Rep., *supra,* p. 195.)

Cua's brief relies heavily on *Brown v. Farwell* (9th Cir. 2008) 525 F.3d 787, a federal habeas corpus case reversing a state court conviction for sexual assault. The Ninth Circuit panel found, with one judge dissenting, due process violations in admission of "unreliable" testimony of a criminalist of a DNA match between the defendant and semen from the victim's underwear. (*Id.* at pp. 795–796.) Among other things, the court found error in permitting the criminalist to testify that there was a "99.99967 percent chance" that the defendant was the assailant. (*Ibid.*) The court found that this testimony mischaracterized the random match probability. The court also questioned the criminalist's conclusions regarding the significance of genetic similarities with the defendant's siblings, finding that the admission of "unreliable and misleading testimony" violated the defendant's due process rights. (*Id.* at pp. 796–797.)

Cua acknowledged in his opening brief that the Supreme Court had granted certiorari in this case (*McDaniel v. Brown* (2009) 557 U.S. ___ [173 L.Ed.2d 468, 129 S.Ct. 1038]), but contended that the Ninth Circuit discussion of the "scientific error" was still good law. In his reply brief, Cua also acknowledged that the Supreme Court thereafter reversed the Ninth Circuit in *McDaniel v. Brown* (2010) 558 U.S. ___ [175 L.Ed.2d 582, 130 S.Ct. 665] (*Brown*), but contends that the Supreme Court decision only "focused on procedural details of federal habeas corpus practice" and has nothing to do with his claims of scientific error. He is incorrect.

In *Brown*, the State conceded that the criminalist had overstated the probative value of the DNA match of the defendant with the crime scene evidence by failing to dispel the prosecutor's fallacy. (*Brown, supra*, 558 U.S. at p. ___ [130 S.Ct. at p. 673].) The Supreme Court, in reversing the grant of habeas corpus, first stated that "the two inaccuracies upon which this case turns are testimony equating random match probability with source probability, and an underestimate of the likelihood that one of [the defendant's] brothers would also match the DNA left at the scene." (*Id.* at p. ___ [130 S.Ct. at p. 671].) The Supreme Court noted that the defense, and a defense expert report, did not contest that the DNA evidence matched the defendant (the criminalist's opinion was that only one in 3 million people would have the same DNA profile as the rapist) and the evidence remained "powerful inculpatory evidence." (*Id.* at pp. ___, ___–___ [130 S.Ct. at pp. 668, 672–673].) Despite the admittedly erroneous statistical characterization, the high court found that "ample DNA and non-DNA evidence in the record adduced at trial supported the jury's guilty verdict . . . ." (*Id.* at p. ___ [130 S.Ct. at p. 675].)

We know of no categorical prohibition, at least in this state,[15] on source attribution—expression by an otherwise qualified expert of an opinion that the quantitative and qualitative correspondence between an evidentiary sample and a known sample from a defendant establishes identity to a reasonable scientific certainty. The reported cases and the scientific literature

[15] Cf. *State v. Buckner* (1995) 125 Wn.2d 915 [890 P.2d 460]. In a 1992 case from this district, *People v. Barney, supra*, 8 Cal.App.4th 798, the court, relying on the 1992 NRC Report, said that "[t]he statistical calculation step is the pivotal element of DNA analysis, for the evidence means nothing without a determination of the statistical significance of a match of DNA patterns. [Citation.]" (*Id.* at p. 817.) The court went on to say that "[i]t is the expression of statistical meaning, stated in terms of vanishingly small match probabilities, that makes the evidence so compelling. To say that the frequency of [the defendant's] DNA pattern is 1 in 200 million in the Black population is tantamount to saying his pattern is totally unique, and thus *only he* could have been the source of the crime scene bloodstains that did not match those of the victim." (*Ibid.*) In a subsequent case, also prior to the release of the 1996 NRC Report, the court clarified that "[p]erhaps it is more accurate to state, as we also did in *Barney*, that evidence of a match 'is *incomplete* without an interpretation of its significance.' [Citation.]" (*People v. Wallace* (1993) 14 Cal.App.4th 651, 660, fn. 3 [17 Cal.Rptr.2d 721].)

suggest otherwise. Although the same evidence, and the reports of prosecution experts, were available to Cua for his own examination and analysis, Cua offers no expert opinion that the conclusion reached by the criminalist lacked factual support and was "scientifically invalid."[16] Here a match was made between Cua and the single-source sample from the vehicle by a qualified DNA expert, as in *Nelson*, at 15 separate loci. While the criminalist was not asked to calculate the rarity statistic of such a match using the product rule, we can readily infer that the odds would also be here, as in *Nelson*, "astronomical" and "tantamount to saying that defendant left the evidence at the crime scene." (*Nelson, supra*, 43 Cal.4th at pp. 1259, 1247.)

If Cua had any factual or legal basis to challenge the expert's testimony, it was his obligation to "fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." (*People v. Partida, supra*, 37 Cal.4th at p. 435.) Had he made such an objection, the prosecution could have elicited the statistical support for the opinion, and the trial court would have had the opportunity to make a fully informed ruling. (See *Geier, supra*, 41 Cal.4th at pp. 609–610.) There are readily apparent tactical reasons why he may have chosen not to do so.

■ We emphasize that we do not attempt here to establish criteria for circumstances under which an expert can testify to unqualified uniqueness or "identity" of a defendant's DNA profile with that contained in an evidentiary sample, nor could we do so on this record. We hold only that the expert is not necessarily precluded from doing so—and that defendant here has failed to meet his burden to show that the court erred in not excluding the evidence sua sponte.

b. *The Evidence from Suzanne Wagner's Panties*

Criminalist Janet Patel was also a criminalist in the forensic biology unit of the San Mateo County Sheriff's forensic laboratory. She was accepted, without objection, as an expert in DNA analysis and comparison. Patel testified that a bloodstain on Suzanne Wagner's panties contained a mixture of genetic material with DNA from three possible contributors: Fernand Wagner, Suzanne Wagner, and Cua. She testified, without objection, to a random probability match of someone with Cua's profile to that in the stain

---

[16] Nor was the testimony a surprise to Cua when Ten, the criminalist, testified at trial. Her conclusion expressed at the preliminary hearing was that the DNA profiles from the evidence sample and from Cua "were a match." On cross-examination, Ten was asked, "In other words, the sample that you matched, meaning the stain, you have enough of a sample to determine *it belongs to Mr. Cua*?" (Italics added.) Her answer was "Yes."

of one in 49 million African-Americans, one in one million Caucasians, and one in 1.6 million Hispanics. Cua contends, again without any expert support, that the testimony was "scientifically unreliable, because it failed to take into account any Asian population databases."

We first observe that there is absolutely no evidence in the trial record before us as to Cua's ethnicity. Cua says that he is "Asian," but he cites only to statements in the posttrial sentencing report claiming that his mother is Japanese and that his father lived in Hawaii. He also asserts that the jury could see that Cua "looked Asian" and refers us to a trial exhibit photograph of Cua that is not part of the appellate record. We would seriously question the "scientific validity" of an attempt by any trier of fact to assess an individual's ethnic heritage, or what population group (or subgroup) they might belong to, based solely on stereotypical views of appearance, particularly in our multicultural and multiethnic society.[17] However, whatever credence we might give to the dubious assumption urged by Cua, it matters not at all.

■ " 'One strangely persistent fallacy in the interpretation of DNA evidence is that the relevant ethnic or racial population in which to estimate a DNA profile frequency necessarily is that of the defendant. The issue has been cogently analyzed, and it should be clear that the relevant population is the entire class of plausible perpetrators.' " (*People v. Wilson, supra*, 38 Cal.4th at p. 1243, quoting Kaye, *Logical Relevance, supra*, 3 Law, Probability & Risk at p. 211.) As Professor Kaye notes, "it is critical to understand the limited role that the defendant's ethnic or racial status plays in evaluating the evidence of a match. . . . The relevant population consists of all people who might have been the source of the evidence sample. In most cases, this will not be people with a defendant's peculiar ancestry, but people of many ethnic groups." (Kaye, *DNA Evidence, supra*, 7 Harv. J.L. & Tech. at pp. 137–138, fn. omitted.)

As the Supreme Court emphasized in *People v. Wilson*, " '[t]he random-match probability is meant to measure the rarity of the genetic profile detected in the evidence sample and in the defendant by estimating the frequency with which it occurs in the population of *possible suspects*. As explained in the 1996 NRC Report: [¶] "Suppose that a DNA sample from a crime scene and one from a suspect are compared, and the two profiles match

---

[17] An additional difficulty with Cua's argument is that Asian-Americans " 'are not a homogeneous group. There are many subgroups—Chinese, Indonesian, Japanese, and Korean, to name a few—and each subgroup can be parsed still more finely.' " (*People v. Wilson, supra*, 38 Cal.4th at p. 1247, quoting Kaye, *Logical Relevance: Problems with the Reference Population and DNA Mixtures in* People v. Pizarro (2004) 3 Law, Probability & Risk 211, 215 (hereafter Kaye, *Logical Relevance*).)

at every locus tested. Either the suspect left the DNA or someone else did. We want to evaluate the probability of finding this profile in the 'someone else' case. That person is assumed to be a random member of the population of possible suspects. So we calculate the frequency of the profile in the most relevant population or populations. The frequency can be called the random-match probability, and it can be regarded as an estimate of the answer to the question: What is the probability that a person *other than the suspect*, randomly selected from the population, will have this profile? The smaller that probability, the greater the likelihood that the two DNA samples came from the same person." (1996 NRC Rep., [*supra,*] p. 127, italics added.)' " (*People v. Wilson, supra*, 38 Cal.4th at pp. 1244–1245.)

Therefore, "[i]t is relevant for the jury to know that most persons of at least major portions of the general population could not have left the evidence samples. This conclusion is consistent with the recommendations of the 1996 NRC Report." (*People v. Wilson, supra*, 38 Cal.4th at p. 1245, quoting 1996 NRC Rep., *supra*, p. 122, recommendation 4.1 [" '[i]f the race of the person who left the evidence-sample DNA is known, the database for the person's race should be used; if the race is not known, calculations for all racial groups to which possible suspects belong should be made' "].) The Supreme Court also agreed, however, that " 'as the science underlying DNA comparisons continues to improve, the practical significance of the different racial frequencies diminishes.' " (*People v. Wilson*, at p. 1248.)

Criminalist Patel testified that she used "major population groups" within the United States to "get an overall estimate of what—how often I would expect this combination to occur or how many other individuals could also occur—could also contribute the DNA that I see in this mixture, so we used major population groups in the U.S. to answer that question." She was also asked by the prosecution if there were also "numbers within the science to reflect the Asian population." She responded, without objection, that her lab did not have access to statistics for such population groups, but that she would expect calculations for an Asian population "would be in the same range of one in one million to one in tens of millions." Cua now objects that this testimony was speculation, and that because her opinion failed to take into account any Asian population databases, it was "scientifically unreliable."

What is without foundation, expert or otherwise, is that Asian population databases had any special relevance, or more significantly, that they would have provided any assistance to Cua had they been used. He argues that use of an Asian database would have shown that some DNA profiles are much more common among Asians than among other population groups, and that use of those statistics would have "decreased the odds that it was [Cua] who

was the donor." Thus, Cua asserts, he was prejudiced by the failure to include evidence of the prevalence of the genotype in the Asian population. The "evidence" he cites to support this conclusion is the reference in *Soto* to the comparison calculations done by a criminalist of the DNA profile of the Hispanic defendant to four local Orange County databases: Hispanics (one in 189 million); Caucasians (one in 38 million); Blacks (one in 807 million); and Vietnamese (one in 177 million). (*Soto, supra,* 21 Cal.4th at p. 532.) Cua then, however, contends that the evidence in that case was that the Caucasian ratios were one in *three billion,* demonstrating that "the odds of a Vietnamese person's DNA matching the crime scene DNA" was "13 times more likely" than a United States Caucasian. This is a gross distortion and mischaracterization of the data from *Soto.* In *Soto,* the criminalist did comparisons with information from *separate* data sets. The second set of data used came from published FBI databases: "(1) Southwest Hispanic (Texas): 1 in 55 million; (2) Southeast Hispanic (Florida): 1 in 2.3 billion; (3) U.S. Black: 1 in 2.4 billion; and (4) U.S. Caucasian: 1 in 3 billion." (*Ibid.,* fn. omitted.) No comparable regional or national Asian database was used. What the evidence in *Soto* actually shows is that within the local Orange County population genotypes (the area where the crime was committed), the Vietnamese (a subpopulation of Asians) genotype frequency was roughly equivalent to the Hispanic group, and more than four times more *rare* than in the Caucasian population. This result is also entirely consistent with what Cua contends is the "speculative" opinion expressed by Patel that she would expect that variations using an Asian database "would be in the same range of one in one million to one in tens of millions."

The opinion expressed by the criminalist gave the jury relevant information as to the relative rarity in the general population of the genotype found in the crime scene sample. Again, even had Cua not waived this issue by failure to make timely objection, he has failed to demonstrate any error in admission of Patel's opinion.

### c. *The Bathroom Doorframe Sample*

Criminalist Patel testified that she collected the evidentiary samples from the Wagners' residence, including a swab of a red-brown stain from the doorjamb of the downstairs bathroom. The presumptive test for blood was positive. She extracted the DNA from this sample and compared it with the known samples from the victims and Cua. The sample contained a mixture of DNA, and both Fernand Wagner and Cua were identified as possible contributors. She provided genotype frequencies for possible contributors as one in 660 million in the African-American population, one in 110 million

individuals in the Caucasian population, and one in 72 million individuals in the Hispanic population.[18] The evidence was received without objection.

Cua again argues that there was "insufficient foundation" for the prosecution DNA statistics because Cua's "racial group" was not included. Cua contends that statistics were required for "racial groups, or sub-groups, of which [Cua] might be considered a member, including Asian, or Japanese, or Filipino, or native Hawaiian." He asserts that such information is a "requirement" of the 1996 NRC Report. As we have already noted, no evidence was presented that Cua was a member of *any* of these groups (and not even a suggestion made that Cua was "Filipino" or "native Hawaiian"). And as we have already discussed, there is no such "requirement" in either the cases he cites or in the 1996 NRC Report. Likewise his assertion that inclusion of Asian populations would have resulted in genotype frequencies more favorable to Cua is again based only on his mischaracterization of the discussion in *Soto*.[19]

## B. *Prosecutorial Misconduct*

■ Cua contends that it was prosecutorial misconduct for the district attorney to present "scientifically invalid" DNA evidence. In order to make out a federal constitutional violation based on the conduct of the prosecution, a defendant must establish that the challenged conduct " 'comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." [Citation.]' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214–1215 [40 Cal.Rptr.2d 456, 892 P.2d 1199]; see also *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 642–643 [40 L.Ed.2d 431, 94 S.Ct. 1868].) Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of " ' " ' "deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 819 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

Cua fails to show how the proffer by the prosecution of opinions rendered by qualified experts using scientifically accepted methods of analysis constitutes a pattern of "egregious" misconduct, or an attempt to use "deceptive or

---

[18] As previously noted, and as discussed in greater detail *post*, Patel subsequently prepared an amended report revising her calculations of the statistical significance of the DNA because of the low levels of DNA in the diluted sample. Her revised probability match was one in 8.1 million African-Americans, one in 520,000 Caucasians, and one in 620,000 Hispanics. We discuss the significance of this revision in addressing Cua's motion for new trial.

[19] Cua's appellate counsel's discussion of the process of DNA matching also reflects an erroneous assumption that RFLP/VNTR techniques were used in this case, and that the statistics were derived from a "standard DNA statistical table" organized by racial group.

reprehensible methods" to persuade the jury. His claim is in any event forfeited by his failure to object at trial. " 'To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.' [Citations.]" (*People v. Gionis, supra,* 9 Cal.4th at p. 1215.)

## C. *Ineffective Assistance of Counsel*

■ To establish a claim of incompetence of counsel, a defendant must establish both that counsel's representation fell below an objective standard of reasonableness and that it is reasonably probable that, but for counsel's error, the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 686–688, 694–695 [80 L.Ed.2d 674, 104 S.Ct. 2052] (*Strickland*); *People v. Benavides* (2005) 35 Cal.4th 69, 92–93 [24 Cal.Rptr.3d 507, 105 P.3d 1099]; *People v. Ledesma* (1987) 43 Cal.3d 171, 215–218 [233 Cal.Rptr. 404, 729 P.2d 839].) An ineffective assistance of counsel claim fails on an insufficient showing of either element. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126 [36 Cal.Rptr.2d 235, 885 P.2d 1], cert. den. *sub nom. Rodrigues v. California* (1995) 516 U.S. 851 [133 L.Ed.2d 93, 116 S.Ct. 147].)

Generally, prejudice must be affirmatively proved. (*Strickland, supra,* 466 U.S. at p. 693.) "Judicial scrutiny of counsel's performance must be highly deferential." (*Id.* at p. 689.) There is a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (*Id.* at p. 690.) To establish a claim of ineffective assistance of counsel, a " 'defendant must affirmatively show that the [alleged] omissions of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics.' [Citations.]" (*People v. Lanphear* (1980) 26 Cal.3d 814, 828–829 [163 Cal.Rptr. 601, 608 P.2d 689].)

Cua asserts that his counsel[20] were incompetent in failing to object to the introduction of the DNA evidence (and in failing to assert erroneous admission of evidence as a basis for his new trial motion). As we have concluded, there was no error in the admission of the DNA evidence. Cua's claim that his counsel were ineffective therefore necessarily fails, since he is unable to demonstrate any prejudice. (*People v. Rodrigues, supra,* 8 Cal.4th at p. 1126.)

Moreover, the trial record amply demonstrates counsels' tactical decision not to directly challenge the DNA evidence, but instead to attempt to

---

[20] Cua was represented by two trial counsel.

minimize its significance as to Cua, while emphasizing that other DNA evidence at the scene raised the possibility of an unidentified third party being responsible. In opening statement, counsel admitted that Cua had been at the Wagners' home earlier in the day of June 13th, returning later in the day to find the "gruesome scene" and that Cua then "panicked" after finding the bodies and left. He could scarcely have denied that Cua had been in the house in light of the testimony of Edith Edmonds, and Cua's own statements in the letter found in his truck. He told the jury that it would not be unusual to find Cua's DNA in the Wagners' Cadillac, since he would often drive with Fernand Wagner to Wagner's medical appointments. In closing argument, counsel emphasized again the presence of DNA of others at the scene, that Cua was admittedly at the home, and that his DNA was only found in two locations. In acknowledging that Cua's DNA was on two pieces of evidence at the home, he said "[c]ertainly Joe Cua's DNA is on two pieces of evidence. Never denied that. Never tried to hide it, but there was all kinds of DNA evidence."

As further evidenced in the motion for new trial, counsel were aware of the statistical significance of the matches made between Cua's DNA profile and that found in the evidence samples and made a professional judgment not to contest that evidence before the jury.[21] We find nothing to show that this judgment was unreasonable, or that counsels' performance was deficient.

## D. *The New Trial Motion*

Following the jury verdict, on September 3, 2008, criminalist Patel issued an amended evidence examination report concerning the DNA analysis of the stain found on the downstairs bathroom doorjamb. The amended report recited that its purpose was "to re-evaluate the statistical calculations of the low-level DNA samples in this case and to ensure that the statistics reported properly reflect the weight of the evidence. Due to recent changes in the interpretation of low-level mixtures and the statistical calculations associated with those mixtures, a re-evaluation was conducted on the samples in this case. Of these samples, the DNA profile from the swab of the bathroom door frame was found to contain some information at low levels of DNA; therefore the statistic reported in Conclusion 1 has been revised." Conclusion 1 was revised to read: "The DNA profile from the swab of the bathroom door frame (0610269A) is a mixture of a minimum of two people. Fernand Wagner and Joseph Cua are included as possible contributors to this mixture. . . . *One in 8.1 million individuals in the African American population, 520 thousand*

---

[21] There is no indication (nor any claim made here by Cua) that counsel failed to adequately investigate the physical evidence. Counsel made a pretrial motion for preservation of the evidence and noted that "testing of various evidence relating to DNA and blood stains is still ongoing by the prosecution and the defense."

*individuals in the Caucasian population, and one in 620 thousand individuals in the Hispanic population are included as possible contributors to this mixture.* Suzanne Wagner and Marc Wagner are excluded as possible contributors to this mixture."

Cua moved for a new trial based on this new evidence. (Pen. Code, § 1181, subd. 8.) Cua argued that, based on the original analysis, he had been "forced to concede that the DNA on the doorframe belonged to Mr. Cua," and that revised statistics would have supported a claim of third party culpability. The trial court denied the motion, finding that there was "overwhelming evidence of guilt," and that any change in the statistical values used for the DNA sample would not reasonably affect the jury's decision, and would not cause a different result.

■ A defendant may seek a new trial "When new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial. . . ." (Pen. Code, § 1181, subd. 8.) "The standard of review of an order denying a motion for a new trial based on newly discovered evidence was established by this court in 1887: 'To entitle a party to a new trial on the ground of newly discovered evidence, it must appear,—"1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." . . . [¶] "Applications on this ground are addressed to the discretion of the court below, and the action of the court below will not be disturbed except for an abuse of discretion . . . ." ' [Citation.]" (*People v. Martinez* (1984) 36 Cal.3d 816, 821 [205 Cal.Rptr. 852, 685 P.2d 1203].) " '[I]n determining whether there has been a proper exercise of discretion on such [a] motion, each case must be judged from its own factual background. [Citation.]' [Citation.]" (*People v. Dyer* (1988) 45 Cal.3d 26, 52 [246 Cal.Rptr. 209, 753 P.2d 1].)

The trial court here denied the motion on the third criteria—that the evidence was not such as to render a different result probable on retrial. In considering the likelihood of a different result on a motion for new trial, both the trial and appellate courts are asked "to determine whether the inability of the defendant to present the evidence in question prejudiced the outcome of the trial. In viewing such an issue, we justifiably accord considerable deference to the trial judge, 'because of "his observation of the witnesses, [and] his superior opportunity to get 'the feel of the case.' " [Citation.]' [Citation.]" (*People v. Hayes* (1985) 172 Cal.App.3d 517, 524–525 [218 Cal.Rptr. 362].)

In ruling on the motion, the court reviewed the weight of the other trial evidence against Cua. He considered the other evidence placing Cua at the crime scene, the other DNA evidence (including the sample from Suzanne Wagner's panties, and the single-source blood sample from the Cadillac), the evidence of motive from Cua's embezzlement, his physical injuries after the killings, and his "suicide letter." He concluded that the "numbers are still overwhelming that it was Mr. Cua" and that "the change in the statistical numbers for one mixture of DNA stain would not reasonably affect the jury's decision." We find no abuse of discretion.

The case which Cua cites as "particularly applicable," *People v. Drake* (1992) 6 Cal.App.4th 92 [7 Cal.Rptr.2d 790], is not. In *Drake*, the reviewing court upheld the trial court's exercise of discretion in granting a motion for new trial, where the prosecution had failed to disclose to the defense an expert opinion in its possession which was contrary to its trial position. The trial court found that the failure deprived the defendant of a fair trial. (*Id.* at p. 97.) Affirming, the Court of Appeal noted that "[t]he grant of a new trial is a discretionary decision and will not be set aside unless a manifest and unmistakable abuse of discretion clearly appears. [Citation.]" (*Id.* at pp. 97–98.) The prosecution withheld no exculpatory information here, and as the Court of Appeal also observed in *Drake*, "[t]he trial court's factual findings, express or implied, made on a motion for new trial will be upheld if supported by substantial evidence. [Citation.]" (*Id.* at p. 97.)

Cua argues that the "evidence as to identity turned almost solely on the DNA statistics" and that revised statistics for the particular sample showed that, when compared with California's population of 35 million people, four African-Americans, 70 Caucasians and 60 Hispanics might match. Cua's argument ignores that the purpose of the statistical comparisons is to provide the jury only with a gauge of the relative rarity of the DNA profile found in a sample, not to identify a universe of potential suspects, and falls victim to what is known as the " 'defendant's fallacy.' " (1996 NRC Rep., *supra*, p. 133; see Thompson & Schumann, *supra*, 11 Law & Hum. Behav. at p. 171.) "The 'defendant's fallacy' is to assume that in a given population, anyone with the same profile as the evidence sample is as likely to have left the sample as the suspect." (1996 NRC Rep., *supra*, p. 133.) It ignores the other associative evidence which drastically narrows the group of people who are or could have been suspects. (*Ibid.*; Thompson & Schumann, *supra*, 11 Law & Hum. Behav. at p. 171.)

As the trial court correctly observed, more than ample non-DNA evidence (evidence which Cua does not challenge here), connected Cua to the commission of these offenses. Further, Cua did not contest in the trial court, and does not contest here, the test results identifying him as a contributor to the

evidentiary DNA samples. The trial court properly considered the totality of the evidence in denying the motion.

## III.   DISPOSITION

The judgment is affirmed.

Jones, P. J., and Simons, J., concurred.

A petition for a rehearing was denied February 1, 2011, and appellant's petition for review by the Supreme Court was denied April 20, 2011, S190542.