[No. C069153. Third Dist. May 14, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
ZANG HER, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

---

†Pursuant to California rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II and III of the Discussion.

## COUNSEL

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ROBIE, Acting P. J.**—John Lone Eagle was found strangled to death with a telephone cord in his Carmichael bedroom. About $4,000 was missing from his bedroom. DNA consistent with the genetic profile of defendant Zang Her was found in three places in the house—on a latex glove that was tangled in the telephone cord around John Lone Eagle's neck, on a pillow in the same bedroom, and in a blood spot on the entryway floor to the house. Defendant was also linked to John Lone Eagle through defendant's wife and an acquaintance. A jury found defendant guilty of first degree burglary and first degree murder with the special circumstance that the murder was committed

during a burglary. The jury did not reach a verdict on whether defendant personally used a weapon (the telephone cord).

Defendant appeals from the resulting prison sentence of life without the possibility of parole, raising three issues relating to the evidence and the jury's composition. Finding no merit in these contentions, we affirm.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

### A

### *The Prosecution's Case*

John Lone Eagle operated a business out of his home in which he bought and sold foreclosed homes. He employed four or five women to help him, and he transacted a lot of business in cash, which he kept in the house, oftentimes in plain view.

In the summer of 2004 when he was murdered, John Lone Eagle was in poor health and was not very mobile. One August morning, an employee arrived at his house to start work. The door was unlocked and the house had been ransacked. She went into his bedroom and saw him on the bed with a pillow over his head. When she shook him and he was unresponsive, she noticed there was blood all over his pillow and shirt. She called 911.

Police arrived and pronounced John Lone Eagle dead. He had been strangled with a telephone cord that was still around his neck.

Forensics testing by criminalists Kristie Abbott and Jeffrey Herbert was conducted on the pillow, the glove, and bloodstains found on the ground in the entryway to the house, on the wall behind the front door, and on the wall of the stairwell.

As to three bloodstains on the pillowcase, they contained a mixture of DNA from two contributors. In one of those samples (DNA 5), the major contributor had a DNA profile that "was the same" (meaning the profile matched defendant's at all 15 designated loci on the genome) as the reference profile of defendant's, and the minor contributor had a DNA profile that

---

[1]Defendant died in December 2012. Defendant's death during the pendency of the appeal abates all further proceedings in the case. (*People v. Dail* (1943) 22 Cal.2d 642, 659 [140 P.2d 828].) However, we exercise our inherent authority to retain the appeal for issuance of this opinion since it raises important issues of public interest that are likely to recur in other cases. (See, e.g., *People v. Nottoli* (2011) 199 Cal.App.4th 531, 535, fn. 3 [130 Cal.Rptr.3d 884].)

matched John Lone Eagle's. In the Asian population, the chance of a random person having a DNA profile matching defendant's was one in 150 quintillion. The two mixed-source samples (DNA 7 and DNA 9) on the pillowcase contained John Lone Eagle's DNA profile and alleles from a minor contributor at "two and four" of the 15 loci. "The partial profile for the minor contributor to each mixture is consistent with the profile of the major contributor to DNA 5."

As to the glove, it contained defendant's DNA on the inside of three fingers that also contained John Lone Eagle's DNA. Defendant's and John Lone Eagle's DNA were also detected in a mixture on two other spots on the glove, which also contained an "additional allele" that indicated there was a third contributor.

As to the bloodstain found in the entryway on the ground, it contained about an even mixture of defendant's and John Lone Eagle's DNA profiles, as measured by a formula known as the combined probability of inclusion. The chances that a random person in the Hispanic population could have been a contributor to the sample were one in 140 million. In the African-American and Caucasian populations, it would have been even rarer. When using this formula, criminalist Herbert assumed the entryway blood sample contained DNA from only two people, both males, and there was no allelic dropout. Had he not made those assumptions, the numbers would have been "more common."

As to the bloodstain on the wall in the stairwell, it contained DNA from only one person—John Lone Eagle.

As to the bloodstain on the wall behind the front door, it contained DNA from an unknown male. Besides being linked to John Lone Eagle through DNA, defendant was linked to John Lone Eagle through defendant's wife and through an acquaintance named Derek Wong. About two months after the murder, police found a piece of paper in Wong's house that contained John Lone Eagle's address. In a recorded phone call between defendant and his wife, defendant admitted being introduced to Wong by his wife.

## B

### The Defense

Defendant worked for a paint store at the time of the murder. As part of his job, defendant often had to wear latex gloves that were similar to the one found at the crime scene. Based on this evidence, defense counsel argued that

defendant's discarded work gloves were used by the real killer when he murdered John Lone Eagle.

## DISCUSSION

### I

*The Trial Court Was Within Its Discretion to Admit Partial DNA Profile Evidence Without Accompanying Statistical Analysis*

Defendant contends the trial court erred in allowing the People to admit testimony that a partial DNA profile in two mixed-source samples on John Lone Eagle's pillowcase was consistent with defendant's genetic profile. He argues that because the testimony about those samples was not accompanied by any statistical analysis, it had no probative value. As we will explain, defendant is wrong.

■ In California, only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is that "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.) An appellate court reviews a trial court's evidentiary rulings for abuse of discretion. (*People v. Venegas* (1998) 18 Cal.4th 47, 93 [74 Cal.Rptr.2d 262, 954 P.2d 525].) Here, the trial court ruled that the People's expert could testify the partial DNA profile detected in both mixed-source samples was consistent with defendant's DNA because it was relevant circumstantial evidence of the perpetrator's identity in the context of other DNA evidence. This ruling was well within the court's discretion.

One of the People's DNA experts, Kristie Abbott, testified only that the alleles in the partial profiles were "consistent" (as opposed to being a "match") with defendant's DNA profile, meaning he could not be excluded as a possible contributor. The prosecutor in closing argument used the same nomenclature when arguing that the alleles in the partial profile were "consistent" with defendant.[2]

■ This evidence and argument was consistent with case law—both in California and beyond—that DNA testimony need not be accompanied by

---

[2] Defendant argues the prosecutor took the argument too far by arguing, "You are also seeing, at least at an extremely low level, alleles that are consistent with defendant but no other person." Contrary to defendant's suggestion, the phrase "no other person" referred not to the entire population, but to John Lone Eagle and to other people whose DNA was tested as part of the investigation in this case.

statistical analysis. In California, Division Five of the First Appellate District upheld admission of testimony that DNA evidence at the scene " 'belonged to' " the defendant, where the People did not provide statistical support for that conclusion. (*People v. Cua* (2011) 191 Cal.App.4th 582, 596, 597, 600 [119 Cal.Rptr.3d 391].) Other state courts have ruled in cases similar to the one here that evidence of a partial DNA profile consistent with the defendant's profile is relevant and admissible absent statistical analysis. The Nevada Supreme Court explained it this way: "DNA nonexclusion evidence is admissible in the absence of supporting statistical data reflecting the percentage of the population that could be excluded as long as the nonexclusion evidence is relevant, because any danger of unfair prejudice or of misleading the jury is substantially outweighed by the defendant's ability to cross-examine or offer expert witness evidence as to probative value." (*Rodriguez v. State* (Nev. 2012) 273 P.3d 845, 851.) A Missouri appellate court ruled as follows in response to a defendant's contention that, without that statistical analysis, the conclusions of the People's DNA experts were irrelevant and, therefore, inadmissible: "Even though a full genetic profile was not obtained, the circuit court could rely on the partial profiles that left [the defendant] as a possible source of the DNA along with the other evidence in determining guilt. 'The weight to be afforded this evidence was within the province of the [fact-finder] to decide.' " (*State v. Harding* (Mo.Ct.App. 2010) 323 S.W.3d 810, 817–818, fn. omitted.)

■ The rationale of these cases applies here. The evidence of the two partial profiles was relevant because they were consistent with the profile of the major contributor of the other bloodstains on the pillow and therefore had a tendency in reason to show that defendant murdered John Lone Eagle. Specifically, Abbott testified the three bloodstains on the pillowcase contained a mixture of DNA from two contributors. In one of those samples (DNA 5), the major contributor had a DNA profile that "was the same" as the reference profile of defendant's, and the minor contributor had a DNA profile that matched John Lone Eagle's. In the Asian population, the chance of a random person having a DNA profile matching defendant's was one in 150 quintillion. Abbott further testified the two mixed-source samples (DNA 7 and DNA 9) contained the victim's DNA profile and alleles from a minor contributor at "two and four" of the 15 loci. "The partial profile for the minor contributor to each mixture is consistent with the profile of the major contributor to DNA 5." Thus, because the partial profile was consistent with the profile of the major contributor to the other bloodstains on the pillow, which bore defendant's profile, it was relevant to support the People's theory that defendant killed John Lone Eagle. The court did not abuse its discretion in admitting the evidence.

## II, III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

As noted at the beginning of our opinion, defendant has died, and his death abates all further proceedings in the case. (*People v. Dail, supra,* 22 Cal.2d at p. 659.) We therefore remand the case to the trial court with directions to enter an order that all proceedings in the case have permanently abated. (See *In re Jackson* (1985) 39 Cal.3d 464, 480 [216 Cal.Rptr. 760, 703 P.2d 100].)

Mauro, J., and Duarte, J., concurred.

On June 12, 2013, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied September 11, 2013, S211769.

---

*See footnote, *ante,* page 977.