Filed 9/9/22 P. v. Dodge CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| THE PEOPLE, | C092621 |
| Plaintiff and Respondent, | (Super. Ct. No. SCCRCRF201911461) |
| v. | |
| EDDIE SAMUEL DODGE, JR., | |
| Defendant and Appellant. | |

A jury found defendant Eddie Samuel Dodge, Jr., guilty of first degree murder of Hunter Sims (count 1), second degree robbery (count 2), and possession of a firearm by a person who has been convicted of a felony (count 3). The jury found true the special circumstance that defendant committed the murder intentionally and for financial gain (Pen. Code, § 190.2, subd. (a)(1))[1] and, as to counts 1 and 2, the jury also found true that

---

[1] Undesignated statutory references are to the Penal Code.

1

defendant personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)).

In a bifurcated proceeding, the trial court found one of two prior strike allegations to be true.[2]

The court denied defendant's motion for a new trial.

The court sentenced defendant to prison for 6 years (3 years doubled for the prior strike) for count 3, and a consecutive indeterminate term of life without the possibility of parole for count 1, plus 25 years to life for the firearm enhancement on that count. The court also imposed and stayed pursuant to section 654 a 10-year sentence (5 years doubled) on count 2, plus 25 years to life for the firearm enhancement.

On appeal, defendant argues: (1) the trial court erred in permitting the prosecution to present evidence of a 1998 robbery as "common scheme or plan" evidence; (2) the jury instructions regarding the use of this prior crime evidence were incorrect and misleading; (3) the court erred in excluding certain third-party culpability evidence; (4) the prosecutor committed misconduct in his arguments to the jury; (5) the court erred in denying defendant's motion for a new trial; and (6) the cumulative effect of the alleged errors necessitates reversal. We will affirm the judgment.

## I.  BACKGROUND

On February 7, 2019, the victim's body was found in a tree line near a turnout on Eddy Creek Road in Siskiyou County. There was a pool of blood on the side of the road and a trail of blood from the edge of the road to the body. A detective with the Siskiyou County Sheriff's Department who responded to the scene opined based on this evidence, the location of four shell casings, and indentations in the gravel, that the victim was on

---

[2] The court granted the prosecution's request to dismiss the other prior strike allegation.

2

his knees on the shoulder of the road when he was shot in the back of the head and then dragged by the legs into the tree line.

The forensic pathologist who performed the autopsy on the victim testified that there were abrasions on his back from being dragged. There were three gunshot entrance wounds in the back of the head and upper neck area. The forensic pathologist opined that the cause of death was the gunshot wounds to the head and that the gun was fired from more than a foot away.

R. testified she was defendant's friend and had known him for 10 years. She met the victim through another friend and had helped him buy marijuana. The victim called her in January 2019 for help purchasing a couple of hundred pounds. R. contacted defendant, who said he could help fill the order. Defendant brought marijuana to the victim, and R. was paid a few thousand dollars for her part in the transaction. R. then helped the victim purchase the additional 45 pounds he needed elsewhere.

According to R., the victim called her again a couple of days before February 4 to say he was looking to buy 320 pounds of marijuana and 500 pounds of trim. When he arrived in town, the victim, defendant, and R. met at defendant's mother's house to look at marijuana samples. The next day, February 5, the victim called R. to say he had the money and he wanted to know where to store the cash safely. She suggested leaving it at defendant's mother's house, and then arranged this with defendant. That evening, defendant, the victim, and R. met at defendant's mother's house and R. and the victim wrapped $200,000 into separate tinfoil bricks.

R. testified that defendant told her the location of the purchase was the house of an older Asian couple that he had known for a while and had worked with before. Defendant said he had been to the house several times and it was 45 minutes away. After the money was put into the trunk of defendant's car, defendant said there was a change of plans and the Asian couple only wanted defendant and the victim to go. Defendant and the victim left in separate cars.

3

R. testified the victim called her once to say he had forgotten to fuel up and so he and defendant had stopped for fuel, and another time to see if she could find out what was going on because they had pulled on and off the interstate several times. R. called defendant who said he had gotten off at the wrong exit, but they were almost there. It was about 11 p.m. About an hour later, defendant called R. and said the meet had been a setup, and they had been ambushed. Defendant said they had been shot at and took off running. According to defendant, he got into his car and assumed that the victim had done the same because he could see headlights in his rearview mirror.

R. said she took her friend Mike with her to meet defendant because she did not feel comfortable going by herself and defendant was "acting different." They met at a gas station. Defendant had been wearing a dark sweatshirt when she last saw him, but now he was wearing a white sweatshirt. Defendant opened the trunk of his car and told R. to grab the box of money that he said the victim had left there. The box contained $50,000. Defendant told R. that the rest of the money had been left in the Asian couple's house. After R. put the money in her car, they all went to Mike's house.

R. testified that defendant explained he and the victim went inside the Asian couple's house and looked at the marijuana, and the victim brought some of the money inside. An Asian "dude" who was not supposed to be there came in through the back door. This made the victim nervous, and defendant and the victim went outside to talk, leaving the money inside the house. When they got outside, shots were fired at them. According to R., defendant said he needed an alibi. He noted there was a paper trail because he had to use his credit card when he and the victim had stopped for gas. R. tried calling the victim, but he did not pick up. She could not get a direct answer from defendant as to the location of the house. Defendant said he could not remember but told her the exit number was 716. R. drove north on I-5 looking for the exit, but there was no such exit number.

4

According to R., the next day, defendant's mother drove as defendant directed her to try various exits looking for the location. Eventually, defendant confirmed one of the exits was correct and said the house was a ways down the road, but ultimately suggested they turn around even though they never found it. R. testified that although defendant had originally claimed he did not know the Asian man who had interrupted the marijuana deal, during the drive, defendant said he could not believe "that dude was there." When R. asked defendant who he was talking about, defendant said, "Gip." R. asked who Gip was. Defendant responded, "Gip, that's the dude that came through the back door, that's how I met the Asians." Later, R. testified that she had never heard of Gip. She said she remembered asking defendant if it was "Gap," and he said, "no, it was Gip, like as in Gippers."

William testified that he met defendant in prison. In February 2019, defendant asked him if a particular gas station had a camera. Defendant also gave William directions to a bridge to pick up four bullet casings. Defendant told William that he went outside to smoke during a marijuana deal and "two Hmongs" came around from either side of the house and eventually started shooting. Defendant said he and his partner ran for their separate cars, and as defendant drove away, he stuck his arm out his window and shot back four times. William asked defendant if he was sure he did not shoot at his partner. Defendant responded, "[W]ell, I hope not."

A Senior Criminalist for the Department of Justice testified that she took DNA swabs from the victim's pants, and from that she obtained mixtures from at least three to five contributors and thus was not able to interpret any of the results. One of the samples was sent to DNA Labs International in Florida. The other samples had indications of more than five contributors and would not be accepted.

A Senior DNA Analyst from DNA Labs International analyzed the sample that was sent. The analysis showed "the DNA profile obtained from the extract is approximately 580 trillion times more probable if the sample originate[s] from

5

[defendant], [the victim,] and three unknown people than if it originated from [the victim] and four unknown persons." The analysis indicated 63 percent of the DNA mixture was from the victim. The best fit for defendant's DNA profile was the number two contributor, which constituted about 30 percent of the mixture. The other contributors were each between about one and four percent of the mixture.

Among the evidence presented by defendant was testimony from a Department of Fish and Wildlife Warden that was part of a team that specializes in environmental crimes associated with the cultivation of marijuana. The warden testified that in August 2019 he went to a property on Edgewood Drive near Weed to execute a search warrant. He said the people at the residence were of Asian descent. There was a greenhouse, an outdoor cultivation site, and a secondary building used for processing marijuana. The warden testified regarding how to get to the property from exit 751 on I-5.

## II. DISCUSSION

### A. 1998 Robbery

Defendant raises various claims regarding the evidence of a 1998 robbery conviction. He contends the trial court erred in permitting the prosecution to present evidence of this robbery as "common scheme or plan" evidence. Relatedly, he contends his trial counsel's failure to assert a federal due process basis for this argument was ineffective assistance of counsel. He also argues jury instructions regarding the use of this evidence were incorrect and misleading. We will affirm the trial court's ruling and reject the assertion of instructional error.

### 1. Trial Court's Admission of Prior Crimes Evidence

Prior to trial, the prosecutor sought to introduce evidence of the 1998 robbery at trial under Evidence Code section 1101, subdivision (b). The prosecution's brief explained that after recruiting Thomas Machen to assist him, defendant robbed a credit union in Redding. Defendant also received assistance from Christina Dunn, who worked at the credit union and had told him about the service of the ATM and the employees who

6

serviced the machine. She paged him when they arrived. Machen was the driver. Defendant got out of their vehicle and pointed a handgun at the men and asked for the money before taking a bag of $90,000 cash from one of them. Defendant left in the vehicle and discarded his clothing, the dispenser that had been holding the cash, part of his firearm, the mask he had been wearing, and the bag the money had been in. He gave a large amount of the cash to his mother and to Dunn. The prosecutor argued the 1998 robbery was admissible to show a common scheme or plan and motive. He asserted, "[i]n both the prior robbery and the robbery before this Court the defendant enlisted the assistance of confederates, identified a place where an extremely large amount of cash would be isolated at a place and time, used a female assistant to isolate the victim, utilized available electronic communication devices to accomplish the logistical arrangements, used a firearm, personally robbed the victim using that firearm, and discarded the incriminating evidence before it could be discovered in his vehicle or on his person." The prosecution argued the evidence was "uniquely relevant" to show how defendant had learned from his prior robbery conviction how to avoid inculpating himself.

In a supplemental memorandum of points and authorities, the prosecutor emphasized that the purpose of the evidence was not to prove identity, but instead to show motive, knowledge, common plan or scheme, and absence of mistake. The prosecutor argued the 1998 robbery was relevant to defendant's knowledge of "how to plan and prepare to commit the crime of robbery." The prosecutor also argued the 1998 robbery was relevant to prove an absence of mistake to rebut defendant's assertion that he was engaged in a drug transaction that went wrong: "His prior robbery puts in clear relief that [the victim]'s death was no mistake, but was orchestrated by the defendant as he has orchestrated a massive robbery haul in the past."

Defense counsel opposed the admission of the 1998 robbery, arguing, in part, that the prior robbery was not sufficiently similar to the current crime to prove a common

7

scheme or plan. Counsel argued that any similarities between the prior robbery and the present offense were "either too generic to matter or the product of conjecture and inference themselves." Counsel further argued that evidence of the 1998 robbery should be excluded under Evidence Code section 352. Further, defense counsel argued using the prior offense to explain that defendant had learned how to avoid detection was not a permissible purpose under Evidence Code section 1101, subdivision (b).

At the hearing on this issue, the prosecution explained its view of the similarities between the 1998 robbery and the present offense, including that they both involved: (1) substantial planning; (2) a female who brought up an opportunity for defendant, was "used to isolate the money and the victims," was trusted by the victim(s), and was paid in cash; (3) defendant pointing a semiautomatic firearm at the victim's head; (4) defendant discarding evidence in remote locations; and (5) defendant paying his mother and using her as an alibi.

Defense counsel argued that the two offenses were dissimilar, in that, unlike the 1998 robbery, here defendant acted alone, no actual violence was committed, and the female's involvement was much less. Counsel also argued that the prosecution was seeking to admit the 1998 robbery to show defendant's predisposition to commit the current offense.

The trial court found "adequate evidence of a common scheme or plan." It found "a similar template or model of action" in both cases. It found both cases "reflected a plan or scheme to take an exceptionally large amount of cash from the immediate possession of a person or persons by the use of force or threat of force with a firearm," and that both cases involved defendant pointing a firearm at the head of the person with this cash. The court also found that both cases involved the assistance of individuals who understood that they were involved in a criminal operation and who expected financial

compensation.[3]  In both cases, the woman involved was connected to defendant "by some allegiance and situation of trust."  And, "perhaps most importantly," the court found that both offenses involved planning over days or even weeks; "neither situation was a spontaneous or random crime."

The court further stated that "based on what I've seen so far it appears that there's likely to be an implication from the defense that the defendant was simply mistaken thinking that he was involved in an actual drug purchase transaction, a legitimate one, that had been arranged but that he was mistaken as it turned out to be a violent robbery. So this evidence potentially could be used to overcome that possible position by the defense."

The court also concluded that the admission of the 1998 robbery would not be unduly prejudicial under Evidence Code section 352 for several reasons.  The jurors would already be made aware defendant was a convicted felon when the murder was committed.  The jury would not be tempted to falsely convict defendant to ensure punishment for the prior robbery because the jury would be advised he had served a substantial prison term for that offense.  There would be no danger of the jury reaching "a false conclusion" regarding defendant's responsibility for the prior robbery because he had already been convicted of the offense.  The prior robbery "was considerably less serious" than the present offense. Presenting evidence of the prior robbery would not consume undue time or cause confusion.  And finally, the court explained that it would be giving a limiting instruction to the jury "both at the time of the admission of the evidence and at the time of the charge to the jury."

---

[3]  In an aside, the trial court noted the victim was also such a person, in so much as he thought he was an accomplice in a drug deal rather than his own murder.  Unlike defendant, who incorrectly states the court suggested he was an accomplice in the robbery and murder, we ascribe no import to this comment.

9

The court therefore granted the motion to present evidence of the 1998 robbery. This evidence was ultimately presented at trial.

### 2. *Common Plan Admissibility*

Evidence Code section 1101, subdivision (a), " 'expressly prohibits the use of an uncharged offense if the only theory of relevance is that the accused has a propensity (or disposition) to commit the crime charged and that this propensity is circumstantial proof that the accused behaved accordingly on the occasion of the charged offense.' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 25 (*Chhoun*).) " 'Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition,' such as identity, common plan, or intent. [Citation.] Evidence of uncharged crimes is admissible to prove identity, common plan, and intent 'only if the charged and uncharged crimes are sufficiently similar to support a rational inference' on these issues." (*People v. Edwards* (2013) 57 Cal.4th 658, 711 (*Edwards*).)

" 'The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] . . . In order to be admissible to prove intent, the uncharged conduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' [Citations.]" [Citation.]' [Citation.] 'A greater degree of similarity is required in order to prove the existence of a common design or plan. . . . [E]vidence of uncharged misconduct must demonstrate "not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are individual manifestations." ' [Citation.] 'The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. . . . [T]he uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] "The pattern and characteristics of the crimes must be

so unusual and distinctive as to be like a signature." [Citation.]' [Citation.] ' " 'The highly unusual and distinctive nature of both the charged and [uncharged] offenses virtually eliminates the possibility that anyone other than the defendant committed the charged offense.' " ' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1328.)

"We review the trial court's determination for abuse of discretion, and view the evidence in the light most favorable to the trial court's ruling." (*Edwards, supra*, 57 Cal.4th at p. 711.)

Defendant argues the trial court erred in admitting evidence of the 1998 robbery as common scheme or plan evidence because it had little in common with the charged crimes beyond characteristics they shared with many other robberies such as the taking of cash by force or threat of force using a firearm, paying an accomplice, and using a mother as an alibi. "To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual. . . . [E]vidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts. Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403 (*Ewoldt*), superseded by statute on other grounds.) Further, it is " 'the *combination of similar factors* common to' both crimes that rendered them distinctive" and made the 1998 robbery evidence relevant for a nonpropensity purpose. (*Chhoun, supra*, 11 Cal.5th at p. 27.)

Defendant notes only the present offenses involved luring the victim to his death during a drug deal and shooting the victim. While this is true, as the People observe, both robberies involved substantial planning, the 1998 robbery targeted $90,000 in cash and

11

the current robbery targeted $200,000 in cash, in both instances the cash was obtained by pointing a firearm at the victim's head or shooting him in the head, a trusted female acquaintance made both robberies possible and received a payout, and both robberies involved the discarding of evidence. We agree with the People that these similarities, considered together, were sufficient to support the inference that defendant engaged in a common design or plan, the relevance of which was to show that he "perpetrated the present robbery in the manner theorized by the prosecution." (See, e.g., *People v. Vargas* (2020) 9 Cal.5th 793, 819 [concluding there was enough evidence to support a conclusion of common plan or scheme where both robbery charges had a substantially similar design in which defendant approached victims, brandished a black gun, and asked for money]; *People v. Johnson* (2013) 221 Cal.App.4th 623, 635 [affirming admission of prior robbery where both crimes were home invasion robberies to obtain drugs that involved knocking and forcing entry; defendant was the mastermind assisted by two accomplices].)

Defendant also argues the almost 20-year gap in robberies weighed against the admission of the evidence, and that "[i]f any doubt remained that the 1998 robbery had so little probative value that it should be excluded, this factor should have resolved it." We are unpersuaded. Our Supreme Court has affirmed the admissibility of evidence of crimes separated by a similar length of time. (See, e.g., *Ewoldt, supra*, 7 Cal.4th at p. 405 ["we held admissible evidence of uncharged misconduct even though one of the prior offenses was committed 15 years before the charged offenses"].) The 1998 robbery was remote, but still sufficiently similar to be relevant to prove a common plan.

"Even if evidence of the uncharged conduct is sufficiently similar to the charged crimes to be relevant for a nonpropensity purpose, the trial court must next determine whether the evidence's probative value is 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury' " under Evidence Code section 352. (*Chhoun,*

12

*supra*, 11 Cal.5th at p. 26.)  This determination is also reviewed for abuse of discretion.  (*People v. Foster, supra*, 50 Cal.4th at p. 1328.)  Under this standard " ' "a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' "  (*Id.* at pp. 1328-1329.)

Defendant's argument with respect to Evidence Code section 352 relies largely on the following passage from *Ewoldt*:  "In many cases the prejudicial effect of such evidence would outweigh its probative value, because the evidence would be merely cumulative regarding an issue that was not reasonably subject to dispute.  [Citation.] This is so because evidence of a common design or plan is admissible only to establish that the defendant engaged in the conduct alleged to constitute the charged offense, not to prove other matters, such as the defendant's intent or identity as to the charged offense. [Citation.]

"For example, in most prosecutions for crimes such as burglary and robbery, it is beyond dispute that the charged offense was committed by someone; the primary issue to be determined is whether the defendant was the perpetrator of that crime.  Thus, in such circumstances, evidence that the defendant committed uncharged offenses that were sufficiently similar to the charged offense to demonstrate a common design or plan (but not sufficiently distinctive to establish identity) ordinarily would be inadmissible. Although such evidence is relevant to demonstrate that, assuming the defendant was present at the scene of the crime, the defendant engaged in the conduct alleged to constitute the charged offense, if it is beyond dispute that the alleged crime occurred, such evidence would be merely cumulative and the prejudicial effect of the evidence of uncharged acts would outweigh its probative value.  In ruling upon the admissibility of evidence of uncharged acts, therefore, it is imperative that the trial court determine specifically what the proffered evidence is offered to prove, so that the probative value of

13

the evidence can be evaluated for that purpose." (*Ewoldt, supra*, 7 Cal.4th at pp. 405-406.)

Defendant argues it is beyond dispute that the charged offense was committed by someone and the primary issue was whether he was the perpetrator. First, "[e]ven if this is so, it is not dispositive. '[T]he prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense.' " (*People v. Jones* (2011) 51 Cal.4th 346, 372.) Second, while it was apparently beyond dispute that the victim died of gunshot wounds and that he lost at least some of his money as a result, the events of the evening were disputed and thus common plan evidence was probative to establish the conduct alleged to constitute the charged offense. There were no eyewitnesses. Instead, the prosecution relied largely on circumstantial evidence to show defendant shot the victim in the head in order to rob him. The 1998 robbery was therefore relevant to corroborate that circumstantial evidence by showing defendant acted pursuant to a common plan or design. (*Chhoun, supra*, 11 Cal.5th at pp. 27-28; see also *People v. Johnson, supra*, 221 Cal.App.4th at pp. 634-635.)

We conclude the trial court did not abuse its discretion under Evidence Code section 352 in admitting the evidence. "Evidence of uncharged crimes is particularly prejudicial if 'defendant's uncharged acts did not result in criminal convictions' because 'the jury might have been inclined to punish defendant for the uncharged offenses.' " (*People v. Case* (2018) 5 Cal.5th 1, 41.) That was not the case here. Additionally, "[t]he danger of undue prejudice is . . . lessened if evidence of the uncharged acts was 'no more inflammatory than the testimony concerning the charged offenses.' " (*Ibid.*) The prior crime evidence was less inflammatory than the charged offenses. Further, as we will discuss next, the jury was correctly instructed on the purposes for which it might consider the evidence. (*Edwards, supra*, 57 Cal.4th at p. 714.) The trial court did not abuse its discretion in admitting evidence of the 1998 robbery to establish a common design or plan. "Because the court did not abuse its discretion under state law, defendant's

constitutional claims also fail." (*Chhoun, supra*, 11 Cal.5th at p. 26.) As such, defendant's trial counsel was not ineffective in failing to advance the federal due process basis for his claims. (See *People v. McPeters* (1992) 2 Cal.4th 1148, 1173, superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106 ["Defense counsel is not required to advance unmeritorious arguments on the defendant's behalf"].) The court did not err in admitting the evidence of the 1998 robbery to prove a common plan.[4]

### 3. Jury Instructions

Defendant contends the jury instructions regarding the use of the prior crime evidence were incorrect and misleading. We disagree. The jury was instructed with CALCRIM No. 375 as follows: "If you decide that the defendant committed the uncharged offense, you may, but are not required to, consider that evidence for the limited purpose of deciding whether: [¶] The defendant's alleged actions were not the result of mistake or accident; or [¶] The defendant had a plan or scheme to commit the offenses alleged in this case. [¶] In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offense and the charged offenses. [¶] Do not consider this evidence for any other purpose."

Defendant argues the instruction should have told the jury to focus on whether there was a plan or scheme that was common to both cases, and that a better instruction would have told the jury that the prior crimes evidence, if believed, may not be considered to prove defendant is a person of bad character or that he has a disposition to commit crimes. Neither of these assertions make the instruction incorrect or misleading.

---

[4] Defendant argues the error in admitting this evidence was compounded by the way the prosecutor argued the evidence to the jury. Because we find no error in the admission of the evidence, we will address defendant's claims regarding the prosecutor's arguments to the jury only in the context of his related prosecutorial misconduct claim.

And, " '[a] party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial.' " (*People v. Buenrostro* (2018) 6 Cal.5th 367, 428.) Defendant did not respond to the People's argument that this claim was forfeited for the failure to raise it in the trial court. Defendant has failed to demonstrate any instructional error cognizable on appeal.

## B.    *Exclusion of Evidence Relating to "Gap"*

Defendant argues the trial court erred in excluding:  (1) testimony of his DNA expert that a third party with the last name Saechao could not be excluded as a donor from the DNA mixture recovered from the ankle area of the victim's jeans; and (2) evidence Saechao was a real person with the nickname "Gap."

### 1.    *Trial Court Proceedings*

During trial, the court held an Evidence Code section 402 hearing for defendant's DNA expert, Marc Taylor, regarding Taylor's analysis of third-party DNA. The court had previously concluded the evidence was inadmissible but indicated the issue could be revisited at such a hearing. The expert testified that he developed a DNA profile from an envelope flap. He also received the DNA analyses performed by the Department of Justice on the mixtures of DNA taken from the victim's clothing. He compared the DNA profile from the envelope flap and concluded that the new DNA profile could not be excluded as a potential donor to various mixtures of DNA found on the victim's jeans. The expert explained the difficulty of dealing with complex mixtures, such as determining how many other people might be in the mixture. He testified he could not place a value on the likelihood of the person having contributed to the mixture. Further, he said, "because we can't give a weight to the inability to exclude somebody and how much of the rest of the population, for example, might not be excluded or a likelihood ratio as I just described, it leaves it so that we're—we have to say this is inconclusive

16

results. We cannot exclude but we also cannot say he's included to any degree of likelihood."

In arguing in favor of admissibility, defense counsel represented he had a witness prepared to testify to observing Saechao lick the envelope in question.

The court ruled this testimony was inadmissible, explaining its exclusion of the third-party evidence as follows:

"Of course the question is whether there is a reasonable doubt as oppose[d] to possible doubt. In the Court's view without any credible evidence with regard to the individual in question actually being placed at the scene of an event that is connected with this crime, without that the Court doesn't think there's an adequate basis for anything other than a possible doubt.

"Certainly if there is evidence, testimony perhaps, by an eyewitness, someone who can testify and have their testimony tested by cross-examination on that issue that would change the—potentially the Court's view as to whether or not the opinion of Mr. Taylor can be presented to the jury; but as things stands [*sic*], the Court's previous ruling is unchanged."

The defense subsequently proposed to offer evidence of three photographs of Saechao, together with testimony of an investigator to identify the photographs and testify that Saechao's nickname is Gap. The court clarified that the investigator did not claim to be a percipient witness and explained it was not inclined to allow defendant to bring in information about a real human "without something that actually substantiates that."

The court continued, "with regard to Mr. Taylor's testimony it was so vague and inconclusive that I think it's close to meaningless. I don't know if there's anything—Mr. Taylor would not in any way give a statistical correlation between his conclusion that that person cannot be excluded from the mix than any other individual. I don't know if any

17

individual in this courtroom or in this county can be excluded from that mix because his testimony was not any more informative than that.

"To me the—looking at that with [an Evidence Code section] 352 analysis it's crystal clear to me that that is far more prejudicial than probative. So that's why that was not included. To go from self-serving hearsay from the defendant of a [moniker] or nickname of somebody to say that that sounds like the [moniker] of somebody else and somebody knows that that second name has been connected with somebody else or some specific individual, that's just a bridge too far."

2.        *Third-Party Culpability Evidence*

" '[T]o be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt [ ] must link the third person either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352.' . . . A trial court's ruling excluding third party culpability evidence is reviewed for abuse of discretion." (*People v. Elliott* (2012) 53 Cal.4th 535, 580-581.)

As a preliminary matter, defendant's suggestion that this case contains a similar error as that which occurred in *People v. Hall* (1986) 41 Cal.3d 826 is incorrect. While the trial court in *Hall* stated it did not believe the proffered third-party evidence in that case would show more than " 'a possible ground or possible suspicion,' " the alleged error was the court's reliance on the *Arline*[5] test, which provided that third-party evidence "is admissible only if it constitutes 'substantial evidence tending to directly connect that person with the actual commission of the offense.' " (*Id.* at pp. 830, 831.) *Hall* rejected

---

[5] *People v. Arline* (1970) 13 Cal.App.3d 200, disapproved in *People v. Hall, supra*, 41 Cal.3d at p. 834.

that rule and held that "[t]o be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. . . . [¶] . . . On the basis of *Arline*, however, the trial court concluded that defendant was required to make a preliminary showing of 'substantial probability' that the third party actually committed the crime. This finding was error. The court's proper inquiry was limited to whether this evidence could raise a reasonable doubt as to defendant's guilt and then applying [Evidence Code] section 352." (*Id.* at p. 833.) Here, at one point, the court stated the question was "whether there is a reasonable doubt as oppose[d] to possible doubt." Unlike in *Hall*, it is clear this trial court applied the correct standard. (See § 1096 ["Reasonable doubt is defined as follows: 'It is not a mere possible doubt' "]; *People v. Ghobrial* (2018) 5 Cal.5th 250, 283 [trial court did not abuse its discretion in excluding testimony "because such evidence raised no more than a ' "possible suspicion" ' of another party's guilt"].)

Defendant contends the trial court indicated a belief that evidence that a person cannot be excluded as a donor to a DNA sample is of no value and asserts that such a belief is also contrary to law. We are not persuaded. Defendant's expert testified that Saechao's DNA could not be excluded as a contributor to the DNA mixtures and that he could not calculate the likelihood that anyone could be excluded. He also testified to the difficulty of providing a statistical analysis with respect to this particular DNA mixture. This supported the court's concern that this particular DNA evidence would not exclude anyone based on the expert's testimony. This was significant given the lack of other evidence linking Saechao to the crime. None of the authorities cited by defendant involved the admissibility of third-party culpability evidence. (See, e.g., *People v. Her* (2013) 216 Cal.App.4th 977, 981 [affirming admission of testimony that partial DNA profile in two mixed-source samples was consistent with defendant's DNA]; *People v. Baker* (2021) 10 Cal.5th 1044, 1063 [noting criminalist testified defendant could not be

19

excluded from partial DNA profile]; *People v. Hovarter* (2008) 44 Cal.4th 983, 1016 [noting jury heard evidence defendant could not be excluded as donor of semen]). Further, none of them stand for the broad proposition that any statement that any person's DNA cannot be excluded is always admissible. For example, in *Her*, this court affirmed the trial court's conclusion that the People's expert could testify the partial DNA profile detected in both mixed-source samples was "consistent" with defendant's DNA "because it was relevant circumstantial evidence of the perpetrator's identity in the context of other DNA evidence." (*People v. Her, supra*, at p. 980.) While we stated that this evidence was consistent with case law that "DNA testimony need not be accompanied by statistical analysis," this case cannot be read as suggesting any evidence that any person cannot be excluded must be admitted. (*Id.* at pp. 980-981; see also *Rodriguez v. State* (2012) 128 Nev. 155, 165 ["we conclude that DNA nonexclusion evidence is admissible in the absence of supporting statistical data reflecting the percentage of the population that could be excluded as long as the nonexclusion evidence is relevant"].) Here, defendant's evidence was inadmissible because it could not link Saechao to the crime or raise a reasonable doubt as to defendant's guilt. Defendant submits "[t]he question whether [defendant] intended to refer to Saechao even though he rendered the moniker as Gip instead of Gap was a question that should have been submitted to the jury for them to determine, in light of the fact that neither Gip nor Gap is a common nickname, and the two are very similar." But in light of R.'s testimony that defendant clarified he saw "Gip" short for "Gippers" and not "Gap," and the expert's testimony regarding the inconclusiveness of his analysis, the trial court did not abuse its discretion in concluding the third-party culpability evidence could not raise a reasonable doubt as to defendant's guilt and that the negligible probative value of the evidence was substantially outweighed by the danger it would create undue prejudice or confuse or mislead the jury. We therefore affirm the trial court's exclusion of the third-party culpability evidence.

*C.*     *Alleged Prosecutorial Misconduct*

Defendant alleges multiple instances of prosecutorial misconduct based on the prosecutor's opening and closing arguments. We will address the allegations separately based on the misconduct alleged and begin with these general principles regarding claims of prosecutorial misconduct:

"The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.] As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) "The primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice." (*People v. Williams* (1997) 16 Cal.4th 153, 254.) " 'A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citations.] In addition, failure to request the jury be admonished does not forfeit the issue for appeal if " 'an admonition would not have cured the harm caused by the misconduct.' " [Citation.] Finally, the absence of a request for a curative admonition does not forfeit the issue for appeal if "the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request." ' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328-1329.)

Where, as here, "the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa, supra*, 15 Cal.4th at p. 841.)

### 1. Alleged Improper Use of Prior Crime Evidence

Defendant contends that certain statements made by the prosecutor during opening and closing argument constituted improper use of the evidence of the 1998 robbery to show defendant's criminal disposition or character.

In his opening argument, the prosecutor argued defendant was not new to robbery, and in 1998 "defendant used a similar pattern. That's why this evidence is relevant, it's not relevant for any other purpose except to show that he used a similar pattern in a prior robbery for a very large amount of money. That very large amount of money is part of the pattern." The prosecutor further argued, "it's also important because in the 1998 robbery the evidence will show you that he also learned some things, he deviated from his pattern so he could be more successful. You see, he got caught last time and you'll hear from the evidence that he got caught partly because of who he trusted, who went with him to the robbery and who else was involved. [¶] The evidence will show you that he did not reveal as much incriminating evidence about himself in this case. He didn't confess to anybody. The people who knew what he did last time is the reason he got caught. So he did vary from his pattern in some respects." Defense counsel objected. After a side bar, the prosecution continued, "that having been said, that's the purpose for which the prior robbery will come in. As I told you, it's to . . . exemplify the defendant uses [*sic*] and the success and the large dollar figure and the little details that you will hear."

Later, the court and the parties discussed defense counsel's earlier objection on the record. Defense counsel moved for a mistrial, arguing that the prior crimes evidence was admitted to show a common plan or scheme and using the prior crime evidence to show

that defendant had learned something was not a proper use of the evidence. Counsel argued the education of defendant was a euphemism for "he's the kind of guy that does this and he's learned to do it better throughout time." Counsel noted that the prosecutor said robbery was not new to defendant, and argued the prosecutor "clearly asked the jury to consider [defendant] to be a robber, not only one now but also one who has learned to do better robberies by the use of different sort of methods in the past. [¶] So that is clearly character evidence." Defense counsel argued a mistrial was required because it was impossible to cure the issue.

The prosecutor argued he was allowed to comment on differences between the prior robbery and the current robbery, and Evidence Code section 1101, subdivision (b) did not say otherwise.

The trial court indicated it felt the prosecutor's argument that defendant had learned from his mistakes was "too close to argument to be appropriate for opening statement" and that it had admonished him to move away from that. The court stated, "to say that a previous robbery is a common scheme to the current robbery is not much different than saying robbery is not new to him. I don't find that to be prejudicial. [¶] So having steered the opening statement away from argument I think there is not prejudice. The motion for mistrial is denied."

As to these comments during opening argument, we find no reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. The prosecutor did not improperly argue the jury should infer from defendant's prior crimes a criminal propensity. Our Supreme Court has indicated it is not impermissible to infer from differences from the prior crimes that the defendant has learned from his mistakes. (See *Chhoun, supra*, 11 Cal.5th at p. 27 ["These differences do not undermine the probative value of the crimes' many similarities. If anything, they reveal that defendant and his fellow gang members learned from their recent mistakes and carried out the Elm Street crimes more effectively"].) Moreover, "the trial court

23

properly instructed the jury on the law, and we presume the jury followed those instructions. Indeed, the jury was instructed that, to the extent the law as given by the trial court conflicted with the description of the law as given by the attorneys, the jury was to follow the court's instructions." (*People v. Boyette* (2002) 29 Cal.4th 381, 436.)

In closing argument, the prosecutor referred to defendant's time spent in prison and to William's testimony describing prison as a "college for criminals": "He called it college for criminals where you can learn to do and what not to do for any kind of crime, essentially what he said. [¶] He told us that the defendant had been to the college of criminals. We know he was convicted of armed robbery in 1999. What's important for these purposes is that we know that he was in prison in 2013 and 2014 and he was in prison until [William] left in one of those two years. And so, you know, that's the college of criminals that [William] was talking about. [¶] I think that the evidence shows quite clearly that the defendant's education in that place impacted this case. It also impacted his criminal response to killing [the victim] and again [caused] him in some respects to overreact in this case massively." In contrast, the prosecutor explained the fact that R. did not stop asking what happened by saying she "hadn't been to the same college that [defendant] had." Defense counsel did not object to these statements. On appeal, defendant argues that any objection "would probably have been futile, in light of the court's earlier statements when it denied [his] motion for mistrial." We disagree. During opening argument, the prosecutor inferred what defendant had learned from his original crime. The court emphasized that it steered counsel away from these comments. During closing argument, the prosecutor was commenting on what defendant and other individuals did or did not learn in prison to explain their reactions to the crime. Defendant has failed to demonstrate an objection to this comment would have been futile. Further, to the extent he suggests that these comments were prosecutorial misconduct because they were an improper use of prior crime evidence to show defendant's criminal

24

disposition and character, we must again conclude there was no reasonable likelihood the jury applied the remarks in an objectionable manner.

We reject defendant's claim that the prosecutor committed misconduct by improperly using evidence of the 1998 robbery to show defendant's criminal disposition or character.

### 2. *Alleged Disparagement*

Defendant also contends the prosecutor committed misconduct by disparaging and denigrating defense counsel during his rebuttal argument.

The prosecutor told the jury that, in his opinion, in the middle of defense counsel's closing argument "they went completely off the rails; and what the rails are[,] are the rules. What the rails are[,] are the evidence." He argued the prosecutor "put words in the mouth" of William: "did that sound like what [William] said? Yeah, it didn't, because it wasn't. It was [defense counsel's] almost like a reinterpretation of a book in another language where you put in your own meanings." The prosecutor argued there was no connection between the marijuana growing operation on Edgewood Drive and this case: "The defendant's own words make any involvement of that house an impossibility and everything else does too. There's no connection with this case in any way except in [defense counsel's] imagination." Further, "Unlike counsel, I'm not going to presume and presumptively tell you what to believe. There's no way that we can know when they turned around or . . . how they got to that turnout. There's no way that we can know. You know, this Jedi mind trick of telling you what to believe is inappropriate." Later, the prosecutor added, "When I say Jedi mind trick you guys know what I mean, right? These are not the [d]roids you're looking for, right? Jedis can make you think things."

The prosecutor asserted what defense counsel was "arguing to you is not the evidence. He's violated the third sentence of what the Court is asking you to base your verdict upon, and that is the theme that happens over and over and over."

25

The prosecutor urged the jury to "disregard all of these arguments that do not resonate with you as consistent with the evidence. . . . It is consistent with the law, it's consistent with the instructions and it is consistent with your duty to take those things that counsel manufactures amongst the evidence and take them out because they're not real. They're not true and they're not evidence." Defense counsel did not object to any of these statements.

Then, the following exchange occurred:

"[Prosecutor:] Sometimes when you hear a lawyer talk about a person or a family that lives in a house on Edgewood and I may personally not agree with what they do for a living, I may personally prosecute them for misdemeanors—growing marijuana like they did is a misdemeanor, unless you do something really bad to the environment—but to hear somebody call them murderers or accomplices to a murder or aiders and abetters to a murder is shameful.

"These people that live in that home who are Laotian by their name they had no connection to this case, and to be sl[a]nderized the way that they have been by counsel's arguments is embarrassing and shouldn't happen. There is no evidence to base that upon.

"[Defense counsel]: I'm going to lodge an objection, it's a mischaracterization of the argument. This is disparaging to counsel.

"THE COURT: Do you want to address this on the record?

"[Defense counsel]: Yes. I'll submit it on the objection, Your Honor.

"THE COURT: The objection is overruled."

Defense counsel did not object to a later comment by the prosecutor asserting defense counsel had offered an unreasonable interpretation of the evidence: "That wasn't what was happening 45 minutes later on the Interstate. [Defendant] never said anything about people chasing him or following him. There's nothing about that. That's made up out of whole cloth in [defense counsel]'s imagination. There's no evidence to support it."

26

" ' "A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel." ' " (*People v. Seumanu, supra*, 61 Cal.4th at pp. 1336-1337; see also *People v. Bemore* (2000) 22 Cal.4th 809, 846 ["It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense [citations], or to imply that counsel is free to deceive the jury"].)  "Such attacks on counsel's credibility risk focusing the jury's attention on irrelevant matters and diverting the prosecution from its proper role of commenting on the evidence and drawing reasonable inferences therefrom.  [Citations.] [¶] Nevertheless, the prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account. . . . Misconduct claims . . . have been rejected where the prosecutor anticipates the flaws likely to appear in counsel's closing argument based on evidence that was introduced [citation], and where the prosecutor criticizes the defense theory of the case because it lacks evidentiary support." (*People v. Bemore, supra*, at p. 846.)  " ' "In evaluating a claim of such misconduct, we determine whether the prosecutor's comments were a fair response to defense counsel's remarks" [citation], and whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion.' " (*People v. Seumanu, supra*, at p. 1337.)

Even if we assume defendant's objections were not forfeited by his failure to seek an admonition or object to all of the comments he now alleges were error on appeal, the prosecutor's comments "were not a personal attack on defense counsel, but a critical response to his arguments, and thus a 'fair rebuttal' to the defense theory." (*People v. Woodruff* (2018) 5 Cal.5th 697, 766.)  Our Supreme Court has found no impropriety in similar prosecutorial remarks. (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1155, overruled on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [collecting cases]; see also *People v. Woodruff, supra*, pp. 764-766 [statements that prosecutor " 'would ask for sanctions' " and defense counsel's comments were shameful,

27

" 'despicable,' " and " 'insulting' " were not "disparaging"].)  Thus, we must conclude the prosecutor's arguments did not rise to the level of misconduct.

3.    *Alleged Misstatement of the Law*

Defendant's final assertion of prosecutorial misconduct is based on the prosecutor's alleged misstatement of the law governing the jury's consideration of circumstantial evidence.  We reject this assertion as well.

In closing argument, the prosecutor said there had or would be a suggestion that defendant's DNA was on the victim's clothing because the victim had been at defendant's mother's house.  The prosecutor asked the jury, "Well, is that the more reasonable interpretation or is the more reasonable interpretation that the person who dragged 180 pounds along that path would contribute the second most DNA to the person who was wearing the pants?"  Defense counsel objected and asked the court to read CALCRIM No. 224.  This instruction provides:  "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.  [¶]  Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty.  *If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence.  However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable*."  (Italics added.)  The jury had been read the instruction prior to closing argument.

After an unreported sidebar, the court stated:  "For the record we did have a brief sidebar which we'll address on the record later.  [¶]  Go ahead, [prosecutor]."  After he resumed, the prosecutor argued "the only reasonable inference of that particular piece of evidence is that the defendant dragged [the victim] by the leg to near his final resting

28

place before he was found . . . . That is the only reasonable inference and any other inference is unreasonable." Counsel renewed his objection and again asked the court "to instruct the jury on the proper way to interpret circumstantial evidence according to CALCRIM 224."

Outside the presence of the jury, defense counsel sought a mistrial, arguing the prosecutor had misstated the law when he asked the jurors to decide which potential explanation for the presence of defendant's DNA on the victim's leg "was more reasonable." Defense counsel argued the law requires the jury to accept any reasonable conclusion that points toward innocence, the prosecutor's subsequent argument did not cure the issue, and the court's failure to sustain the objection and read CALCRIM No. 224 left the jury with the "the impression that the objection is not well founded and that what [the prosecutor] is saying to the jury is in fact a correct statement of the law, which it is not."

The trial court denied defendant's motion for a mistrial and permitted the prosecutor to put the argument in the context of CALCRIM No. 224 by going over the law with the jury. The court explained defense counsel could raise the issue again if the prosecutor did not adequately address it.

The prosecutor resumed his closing argument:

"When we broke I was discussing how [the victim] ended up where he was and how the defendant's DNA found its way to his right leg, his pant leg.

"I submit to you that it's been proven beyond a reasonable doubt that the defendant's DNA was there and that once something has been proven or you determine that something has been proven beyond a reasonable doubt you may use that fact as circumstantial evidence of the defendant's guilt.

"You also must determine whether there are other reasonable conclusions supported by circumstantial evidence, okay, such as that, such as this as an example. Now, if the circumstantial evidence supports reasonable conclusions and one of those

29

reasonable conclusions points to innocence, that's the one that you are to adopt. You heard the judge give those instructions.

"My argument to you and what I've submitted to you this morning is that that is not the case here, that the fact that the defendant's DNA is on [the victim]'s pant leg is proof beyond a reasonable doubt that there's no innocent interpretation, that [is] reasonable, that accrues to his benefit and the Court instructed you, quote, you must accept only reasonable conclusions and reject any that are unreasonable."

On appeal, defendant argues the prosecutor's initial statement that the jury should ask which conclusion was "more reasonable" was prosecutorial misconduct because it misstated the law. "Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 666.)

We conclude there was not a reasonable likelihood the jury understood or applied the complained of comments in an erroneous manner. We agree with the People that the prosecutor clarified the issue. He also referred to the pertinent instructions. We again assume the jury followed those instructions. (*People v. Boyette, supra*, 29 Cal.4th at p. 436.)

We reject defendant's assertions of prosecutorial misconduct.

D.     *Motion for New Trial*

Defendant argues the trial court erred in denying his motion for a new trial. As grounds for his motion, defendant re-raised his claim that the trial court erred in excluding evidence of Saechao's culpability and his claim that the prosecutor committed misconduct during closing argument by improperly describing the law regarding circumstantial evidence. Having already rejected these assertions, we conclude the trial court did not err in denying the motion on these grounds. On appeal, defendant

30

additionally contends the court erred in denying his motion for a new trial based on the grounds of newly discovered evidence and the fact no unanimity instruction was given regarding count 3. We disagree.

### 1. Newly Discovered Evidence

In support of the motion for a new trial, defense counsel submitted an affidavit from Katie stating she saw Gap at a bar around January 4, 2020, and he said, " 'it was easy to set up [defendant] and his friend [the victim] from Texas,' " and defendant " '[wa]s lucky he didn't get smoked too.' "[6] Katie declared that she was initially afraid to come forward with this information. At the hearing on the motion, Katie said she knew Gap from saying hello to each other at the bar and from purchasing marijuana from him. She said Gap told her "along the terms of [the victim]—basically that he got away with setting [the victim] and [defendant] up and that [defendant] was lucky he didn't get basically offed or smoked too just like [the victim] did." Katie testified that she understood Gap to be communicating to her that he got away with murdering the victim and that defendant was lucky he got away that night.

The trial court denied defendant's motion. The court first addressed Katie's credibility. The court noted Katie had been cross-examined about the location of the bar, and she described a location that the bar had not been at in January 2020. The court found "that le[ft] a big question mark as to whether or not this happened at all. [¶] In addition, the scenario [wa]s very questionable." The court described contradictions and what it found to be implausible aspects of her version of events. For instance, the court stated Katie "indicated she had no idea of the close connection between [the man she was living with] and [defendant]. That's extremely hard to believe." The court ultimately

---

[6] At the time, defendant was in the middle of trial. The jury reached its verdict on January 16, 2020.

found her testimony was not credible at all, and thus that it would not result in a different result at a retrial.

" ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' [Citations.] ' "[I]n determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background." ' [Citation.] [¶] In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328.) "In addition, 'the trial court may consider the credibility as well as materiality of the evidence in its determination [of] whether introduction of the evidence in a new trial would render a different result reasonably probable.' " (*Id.* at p. 329.) Defendant acknowledges the trial court's credibility finding, but does not argue it constitutes an abuse of discretion. Given the issues the trial court identified, it "was well within [its] discretion in finding that the proffered new testimony lacked credibility" and would not have changed the result on retrial. (*Ibid.*) Thus, there is no basis for us to interfere with the court's denial of the motion for new trial based on newly discovered evidence. (*Ibid.*)

2. *Unanimity*

As previously set forth, the jury convicted defendant of possession of a firearm by a person convicted of a felony in count 3. During closing argument, the prosecutor said the following regarding count 3: "So you know, ironically this is—this is one charge that can be proven without the homicide. The defendant talked in his text with his friends about having a handpiece. He told [William] that he was armed that night and fired his

32

gun during that situation. So technically you could convict him of that without convicting him of the homicide. [¶] That's not what we're asking you to do, it is the homicide that we intended when he possessed the firearm on this occasion. That's exactly what we're talking about and that's exactly what he did."

Defense counsel moved for a new trial on the ground that because two scenarios were presented to the jury to support count 3, the court had a sua sponte duty to instruct the jury on unanimity. The trial court rejected this argument, finding "beyond a reasonable doubt that this was harmless error" because "the jury found beyond a reasonable doubt that [defendant] in fact committed this murder with a firearm and obviously . . . it's an impossibility to do so without possessing a firearm." On appeal, defendant continues to assert the trial court should have granted his motion based on its failure to give a unanimity instruction with respect to count 3. He does not, however, address the question of prejudice.

"[W]hen the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "Where no election is made, the court has a duty to instruct sua sponte on the unanimity requirement." (*People v. Curry* (2007) 158 Cal.App.4th 766, 783.) Nonetheless, the judgment will be affirmed where the error is harmless beyond a reasonable doubt. (*Ibid*.)

We affirm the trial court's conclusion that any error was harmless because the jury necessarily agreed on an act sufficient to support the conviction when it found defendant guilty of murder and found true that he personally and intentionally discharged a firearm in the commission of that offense. The court did not err in denying defendant's motion for new trial on this basis either.

33

*E.*     *Cumulative Error*

Defendant contends his convictions must be reversed because of the cumulative effect of his alleged errors. "There was, however, no error to cumulate." (*People v. Phillips* (2000) 22 Cal.4th 226, 244.)

## III.  DISPOSITION

The judgment is affirmed.

/S/

_____

RENNER, J.

We concur:

/S/

_____

MAURO, Acting P. J.

/S/

_____

EARL, J.